IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 107,596

STATE OF KANSAS,
*Appellant*,

v.

CYRUS A. TALKINGTON,
*Appellee.*

SYLLABUS BY THE COURT

1.

The factual underpinnings regarding a motion to suppress are reviewed for substantial competent evidence, but the legal conclusion drawn from those facts is reviewed de novo. When the State alleges an area is not within the curtilage, it has the burden of proving that point.

2.

The question of curtilage is a mixed question of fact and law. This court reviews the district court's factual findings for substantial competent evidence and reviews de novo the district court's legal conclusion whether a particular seizure occurred within the curtilage.

3.

Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion. This court normally gives great deference to the factual findings of the district court. The appellate court does not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in evidence.

1

4.

After *Florida v. Jardines*, 569 U.S. __ 133 S. Ct. 1409, 1417, 185 L. Ed. 2d 495 (2013), a search occurs under the Fourth Amendment to the United States Constitution when: (1) the government obtains information by physically intruding on a constitutionally protected area, *i.e.*, persons, houses, papers, or effects; or (2) invades a subjective expectation of privacy that society recognizes as reasonable.

5.

When it comes to the Fourth Amendment, the home is first among equals. It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. The Fourth Amendment does not extend to open fields because an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home.

6.

The area immediately surrounding and associated with the home is the curtilage, which is part of the home itself for purposes of the Fourth Amendment. It harbors the intimate activity associated with the sanctity of a person's home and privacies of life. The extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.

7.

Factors to assess if an area is curtilage include: (1) The proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. These factors do not produce a finely tuned formula that when mechanically applied provide a

2

correct answer to all curtilage questions. Rather, they are useful analytical tools to the central question of whether the area is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection.

8.

This court must accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court.

9.

In determining whether a defendant is able to show the violation of his or her—and not someone else's—Fourth Amendment rights, the definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

10.

A defendant cannot object to the seizure of evidence without proper standing to challenge the validity of the search. On the issue of standing, the burden is on the defendant to show an expectation of privacy in the property searched. A defendant may testify at a suppression hearing to establish his or her standing to challenge a search without jeopardizing his or her defense at trial.

11.

Once standing is established, the State bears the burden on a motion to suppress of proving to the district court the lawfulness of the search and seizure by a preponderance of the evidence.

3

12.

The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. Fourth Amendment standing refers to whether the party challenging a search or seizure personally has a legitimate expectation of privacy that was implicated by the challenged governmental action.

13.

Fourth Amendment rights are personal rights that may not be vicariously asserted. A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his or her Fourth Amendment rights infringed.

14.

As a social guest lacks the requisite property right in a residence or its curtilage, social guests must have a reasonable expectation of privacy in the residence, under United States Supreme Court and Tenth Circuit social guest caselaw, in order to assert their Fourth Amendment rights.

15.

The status as an overnight guest is alone enough to show an expectation of privacy in the home that society is prepared to recognize as reasonable. One merely legitimately on the premises does not have the same legitimate expectation of privacy as an overnight guest. When evaluating a case somewhere in between, *Minnesota v. Carter*, 525 U.S. 83, 86-91, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998), considered the purely commercial nature of the transaction engaged in, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder.

16.

Even social guests who do not stay the night have a reasonable expectation of privacy in the host's home and may therefore challenge a search of the home on Fourth Amendment grounds. According to the Tenth Circuit, a social guest must show a degree of acceptance into the household or an ongoing and meaningful connection to the host's home to qualify for protection under the Fourth Amendment.

17.

Social guests have standing to assert a reasonable, subjective expectation of privacy that their host has in his or her residence. As the curtilage is treated as part of the home itself for Fourth Amendment purposes, a social guest standing in the shoes of his or her host has standing to assert a reasonable, subjective expectation of privacy in the residence, which includes the curtilage.

18.

Where a defendant, as a social guest, has demonstrated that he or she was entitled to the same Fourth Amendment protection afforded his or her host, the defendant has also demonstrated standing to assert a reasonable, subjective expectation of privacy in the backyard, *i.e*., curtilage, of the host's residence.

19.

When the State fails to demonstrate the lawfulness of a challenged search or seizure, the evidence obtained in violation of the defendant's rights under the Fourth Amendment may be suppressed through application of the exclusionary rule. One exception to the exclusionary rule is the doctrine of attenuation, which provides the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated.

20.

Whether the taint of a prior illegality has been purged by sufficient attenuation between the unlawful conduct and the discovery of the challenged evidence is a question of fact reviewed by an appellate court under a substantial competent evidence standard.

21.

When evidence would not have come to light but for the illegal actions of the police, the relevant question is whether the allegedly tainted evidence was discovered through exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

22.

In determining whether law enforcement officers obtained allegedly tainted evidence through exploitation of an illegality, the following factors are considered: (1) the time that elapsed between the illegality and the acquisition of the evidence sought to be suppressed, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. But no one factor is controlling, and other factors also may be relevant to the attenuation analysis.

Review of the judgment of the Court of Appeals in an unpublished opinion filed April 26, 2013. Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed March 6, 2015. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

*Jonathon L. Noble*, assistant county attorney, argued the cause, and *Amy Aranda*, acting county attorney, *Vernon E. Buck*, first assistant county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellant.

6

*Stephen J. Atherton*, of Atherton & Huth, of Emporia, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

MALONE, J.: This interlocutory appeal concerns three issues: whether a residential backyard constitutes part of the curtilage under the Fourth Amendment to the United States Constitution; whether a social guest has standing to challenge the search of the curtilage at a host's residence; and whether drugs subsequently found on the defendant's person after an illegal search of the curtilage should be suppressed as fruit of the poisonous tree.

Police searched the backyard of a residence that defendant Cyrus Talkington was visiting and discovered methamphetamine near the back door. Talkington was arrested, and marijuana was found on his person. Talkington was charged with possession with intent to distribute methamphetamine, felony possession of drug paraphernalia, possession of more than 1 gram of methamphetamine without an affixed Kansas drug tax stamp, trafficking contraband in a correctional institution, and possession of marijuana. The district court granted his motion to suppress, reasoning the methamphetamine was found in the curtilage of the home, that a social guest has standing to assert a host's Fourth Amendment rights in the curtilage, and that the marijuana found on Talkington was fruit of the poisonous tree. The State appealed.

The Court of Appeals reversed, finding the backyard where the methamphetamine was found was not curtilage subject to a reasonable expectation of privacy, the standing issue was thus moot, and the subsequent search of Talkington's person following his arrest was lawful. *State v. Talkington*, No. 107,596, 2013 WL 1859215 (Kan. App. 2013) (unpublished opinion). We granted Talkington's petition for review which argued the

panel erroneously engaged in reweighing the evidence rather than determining if substantial competent evidence supported the district court's suppression order.

Jurisdiction is proper under K.S.A. 60-2101(b) (review of Court of Appeals decisions upon timely petition for review).

FACTUAL AND PROCEDURAL BACKGROUND

Around 4:30 p.m. on June 22, 2011, Lyon County Deputy Sheriff Cory Doudican and Emporia Police Officer D.J. Dragonas drove to a single-family residence in Emporia, Kansas. The officers were looking for Matthew Tucker to arrest on an outstanding warrant. The officers parked and exited their vehicle. As they approached the property, they observed Derric Joshua Garrison and Talkington, each with a leashed dog, walking from the south side of the house. Garrison lived at the residence, and Talkington was a long-time acquaintance who had come to the residence on numerous occasions to visit and to work on cars and mopeds.

Each man dropped the leash he was holding, and the dogs ran toward the officers, while Garrison and Talkington ran to the back of the house. Shortly thereafter, the men returned to the front of the house and restrained the dogs. The officers had a brief conversation with them about their actions and asked if Tucker was at the residence. Talkington stated he did not know Tucker.

Dragonas stayed with the men while Doudican walked to the backyard. Because there was no sidewalk to the back of the house, Doudican walked on an adjacent lot before walking back onto Garrison's property. Doudican was looking for Tucker or any weapons that could be used to ambush the officers. In the backyard, Doudican found a baggie of methamphetamine near a PVC pipe protruding from the ground. The baggie

8

was partially covered by insulation on the ground and was about 3 to 5 feet from the back door of the residence. The baggie was about 20 yards from the property line. Doudican did not realize what it was until he was 5 to 10 feet from it.

Talkington and Garrison were arrested. Talkington was read his *Miranda* rights, see *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and was told he was being arrested for methamphetamine found in the backyard. He said he did not know anything about it. Talkington was transported to the Lyon County Jail where officials discovered a baggie of marijuana during an inventory search of his belongings.

Talkington was charged with possession with intent to distribute methamphetamine, felony possession of drug paraphernalia, possession of more than 1 gram of methamphetamine without an affixed Kansas drug tax stamp, trafficking contraband in a correctional institution, and possession of marijuana. The State also prosecuted Garrison for possession of methamphetamine. Both Garrison and Talkington filed motions to suppress in their respective cases.

In Garrison's case, the district court suppressed the evidence after applying the factors set forth in *United States v. Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987). The court reasoned that the area where the methamphetamine was found was within the curtilage because the contraband was found in very close proximity to the house, Garrison had posted signs dissuading entry upon his property, and some sort of barrier had to be crossed to enter the property.

The district court incorporated all of the testimony from Garrison's hearing into the record at Talkington's suppression hearing, and the parties stipulated that Talkington was Garrison's social guest. At the hearing, Talkington argued that he had a similar right to

9

privacy in the curtilage of the residence where he was a social guest, and the marijuana subsequently found on his person should be suppressed as fruit of the poisonous tree. Both hearings elicited testimony concerning the layout and characteristics of the house and surrounding property.

Garrison's single-family home is located on 0.9 acres, with the majority of the land in the backyard. A sidewalk runs along the front of the house parallel to the street, but no path or sidewalk leads to the backyard. A short rock wall runs along the south side of the property. Doudican estimated it was 2 feet high; however from other evidence, the district court found it was no more than 1 foot high. Several trees line this wall but do not block the view to the backyard and side of the house. The north side of the property has a short wire fence, *i.e.*, three posts connected by wire, which does not inhibit an onlooker from seeing the backyard from an adjacent property. An alleyway runs along the west or rear of the property. A "No Trespassing" sign and a "No Soliciting" sign are affixed to the front of the house.

At Garrison's successful suppression hearing, the district court held the area in which the methamphetamine was found was within the curtilage of his property, and no applicable exception existed for the allowance of a warrantless search. The district court granted Talkington's motion to suppress, reasoning that as a social guest he was entitled to the expectation of privacy enjoyed by his host, Garrison. The court further found that the marijuana was discovered on Talkington at the jail within a short time of the illegal search and that no intervening circumstances existed. Accordingly, the district court held that the marijuana seizure was fruit of the poisonous tree and should be suppressed as well.

The State filed an interlocutory appeal. The Court of Appeals reversed and remanded in *Talkington*, 2013 WL 1859215, at *1. Applying the *Dunn* factors, the panel

10

agreed the location of the methamphetamine near the back door weighed in favor of Talkington and little evidence was presented concerning the use of the property. However, the panel stated that the factors concerning whether the area was protected by an enclosure and whether steps were taken to protect the area from observation, *i.e.*, the lack of enclosed fencing which did not obstruct the view or access to the backyard, weighed in favor of the State. Accordingly, the panel held the backyard was not part of the curtilage, and the subsequent search of Talkington when he was booked into jail was also lawful. *Talkington*, 2013 WL 1859215, at *3-7. Because of its decision that there was no illegal search, the panel did not address whether a social guest has standing to challenge the lawfulness of a search in the curtilage. 2013 WL 1859215, at *6.

We granted Talkington's petition for review pursuant to K.S.A. 20-3018(b) and K.S.A. 60-2101(b) (review of Court of Appeals decisions upon timely petition for review).

DID THE COURT OF APPEALS REWEIGH EVIDENCE WHEN REVERSING THE DISTRICT COURT'S FINDINGS THAT EVIDENCE FOUND IN THE BACKYARD SHOULD BE SUPPRESSED BECAUSE THE AREA WAS CURTILAGE*?*

*Standard of Review*

The factual underpinnings regarding a motion to suppress are reviewed for substantial competent evidence, but the legal conclusion drawn from those facts is reviewed de novo. *State v. Campbell*, 297 Kan. 273, 279, 300 P.3d 72 (2013). When the State alleges an area is not within the curtilage, it has the burden of proving that point. *State v. Fisher*, 283 Kan. 272, 284, 154 P.3d 455 (2007).

The question of curtilage is likewise a mixed question of fact and law. This court reviews the district court's factual findings for substantial competent evidence and

11

reviews de novo the district court's legal conclusion whether a particular seizure occurred within the curtilage. 283 Kan. at 286.

"Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion." *State v. Bird*, 298 Kan. 393, 399, 312 P.3d 1265 (2013). This court normally gives great deference to the factual findings of the district court. *State v. Hardyway*, 264 Kan. 451, 456, 958 P.2d 618 (1998). The appellate court does not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in evidence. *Campbell*, 297 Kan. at 279.

*Analysis*

Talkington complains the Court of Appeals improperly reweighed the evidence in reversing the district court's conclusion that the area searched in Garrison's backyard was curtilage protected by the Fourth Amendment. He contends the district court's order suppressing the methamphetamine found in the backyard was supported by substantial competent evidence and should thus be affirmed.

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Courts have used the reasonable expectation of privacy test from *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring), to establish if the defendant had an actual, subjective expectation of privacy in the area searched and if that expectation was one society was prepared to recognize as reasonable. See *United States v. Sweeney*, No. 14-CR-20, 2014 WL 2514926, at *2 (E.D. Wis. 2014) (unpublished opinion).

12

However, in 2013, the United States Supreme Court clarified that a traditional property rights baseline should be applied to Fourth Amendment cases as well. See *Florida v. Jardines*, 569 U.S. __, 133 S. Ct. 1409, 1417, 185 L. Ed. 2d 495 (2013) (quoting *United States v. Jones*, 565 U.S. __, 132 S. Ct. 945, 951-52, 181 L. Ed. 2d 911 [2012]) ("The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment.").

In *Jardines*, the United States Supreme Court held that police standing on the front porch with a drug sniffing dog entered the curtilage because "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" 133 S. Ct. at 1415. Finding the officers had made an unlicensed physical intrusion onto Jardines' property, Justice Scalia did not apply the *Dunn* factors or consider whether Jardines had a reasonable expectation of privacy in the porch:

> "Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz*. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Jardines*, 133 S. Ct. at 1417.

After *Jardines*, a search thus occurs under the Fourth Amendment when: (1) the government obtains information by physically intruding on a constitutionally protected area, *i.e.*, persons, houses, papers, or effects, 133 S. Ct. at 1414; *or* (2) invades "'a subjective expectation of privacy that society recognizes as reasonable.'" See *Kyllo v. United States,* 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (citing *Katz*, 389 U.S. at 361).

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 133 S. Ct. at 1414. It is a basic principle of Fourth Amendment law that

""searches and seizures inside a home without a warrant are presumptively unreasonable.""" *Kentucky v. King*, 563 U.S. ___, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 [2006]). The "Fourth Amendment does not extend to open fields because an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *State v. Tinsley*, 16 Kan. App. 2d 287, Syl. ¶ 2, 823 P.2d 205 (1991).

The area "'immediately surrounding and associated with the home'" is the curtilage, which is "'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 [1984]). "It harbors the intimate activity associated with the sanctity of a person's home and privacies of life." *Fisher*, 283 Kan. 272, Syl. ¶ 1. "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." 283 Kan. at 286 (citing *Oliver*, 466 U.S at 180). Those factors include:

> "[1] The proximity of the area claimed to be curtilage to the home, [2] whether the area is
> included within an enclosure surrounding the home, [3] the nature of the uses to which
> the area is put, and [4] the steps taken by the resident to protect the area from observation
> by people passing by." *Dunn*, 480 U.S. at 301.

These factors do not produce a finely tuned formula that when mechanically applied provide a correct answer to all curtilage questions. Rather, they are useful analytical tools to the central question of whether the area is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection. 480 U.S. at 301; see *Fisher*, 283 Kan. at 286.

14

In this case, the district court applied these factors following Garrison's suppression hearing in concluding the area was curtilage in which Garrison possessed a reasonable expectation of privacy. Garrison's ruling was not appealed, and it was incorporated into Talkington's suppression hearing. On appeal, the Court of Appeals applied the *Dunn* factors and did not address *Jardines*, which had been released just a month earlier. However, federal circuit post-*Jardines* cases apply both *Jardines* and the *Dunn* factors to curtilage analysis. See, *e.g.*, *Harris v. O'Hare*, 770 F.3d 224, 240-41 (2d Cir. 2014), *as amended* (November 24, 2014); *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013).

On petition for review, Talkington also does not address *Jardines* but argues the Court of Appeals improperly reweighed the evidence when considering the second and fourth *Dunn* factors. Thus, in determining if the area was curtilage, our analysis requires consideration of the *Dunn* factors.

*Proximity of the Area Claimed to Be Curtilage to the Home*

Talkington does not take issue with the panel's analysis concerning this factor. We have recognized there is no fixed distance at which curtilage ends. See *Fisher*, 283 Kan. at 288. The district court noted that Doudican found the bag of methamphetamine within a few feet of the house, just off the two-step stoop to the back door. As the contraband was found in close proximity to the house, the district court found this factor weighed in favor of Talkington.

The Court of Appeals agreed, adding Doudican was 60 feet away when he spotted the bag, he did not recognize it contained drugs until he was within 5 to 10 feet of it, and the bag itself was only 3 to 5 feet away from the back steps. Compare *Fisher*, 283 Kan. at 288-90 (trash bag found approximately 50 yards from residence in rural setting within

15

curtilage); *State v. Mell*, 39 Kan. App. 2d 471, 477, 182 P.3d 1, *rev. denied* 286 Kan. 1183 (2008) (area was not far from residence's back door); *Tinsley*, 16 Kan. App. 2d at 292 (70 feet is a short distance and could be in close proximity to house); *State v. Waldschmidt*, 12 Kan. App. 2d 284, 290, 740 P.2d 617*, rev. denied* 242 Kan. 905 (1987) (yard was immediately adjacent to house).

Doudican's testimony and photographs of the backyard support these observations. The baggie was found in the center of the backyard a few feet from the back steps. See *Brocuglio v. Proulx*, 478 F. Supp. 2d 297, 303 (D. Conn. 2007), *aff'd* 324 F. Appx. 32 (2d Cir. 2009) ("[T]he undisputed immediate proximity of the back yard to the home strongly weighs in favor of a determination that the back yard was curtilage."). Substantial competent evidence supports the district court's factual findings concerning the proximity of the area, and caselaw supports the legal conclusion that this factor weighs in favor of Talkington, *i.e.*, the area was curtilage.

*Whether the Area is Included Within an Enclosure Surrounding the Home*

"'[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience.'" *Dunn*, 480 U.S. at 302 (quoting *Oliver*, 466 U.S. at 182 n.12). While not conclusive, "[f]encing configurations are important factors in defining the curtilage." 480 U.S. at 301 n.4. In rural areas, natural boundaries such as thick trees or shrubbery may indicate an area "'to which the activity of home life extends.'" 480 U.S. at 302 (quoting *Oliver*, 466 U.S. at 182 n.12).

In this case, the district court found the enclosure factor did not weigh in favor of either side, reasoning:

16

"The area in which the contraband was found is not within the formal enclosure surrounding the home. There is a short wire fence on one side of the property with a very short rock wall with a few trees on the opposite side of the property. It is obvious neither barrier is intended to keep neighbors or passersby from viewing the back yard. Further the rear of the property is quite open with nothing preventing a full view of the backyard. Still it may be argued that the barriers on either side of the property are meant to dissuade others from physically entering the property. This factor does not weigh in either side's favor. The ability for one to clearly view the back yard tends to show it should not be considered curtilage, while the barriers, (wire fence, small rock wall, and trees) albeit not significant in stature, still serve to keep people out to some degree."

The Court of Appeals held the facts favored the State, reasoning the house was devoid of a 6-foot-tall wooden fence, and the 1-foot-high rock boundary marker and remnants of the chain-link fence did not obstruct Doudican's view:

"Several facts support the State's contention that Garrison's backyard was not surrounded by an enclosure. Garrison's backyard was not surrounded by a tall fence that blocked all visibility, nor was it well-kept or maintained. An alleyway also ran behind the home and was not visibly obstructed by any sort of fencing. Neither party disputed this fact at Talkington's suppression hearing, though appellate review is somewhat limited because the State's sole photograph of the backyard does not show the alleyway. Nonetheless, the lack of clearly enclosed fencing favors the State. See *Mell*, 39 Kan. App. 2d at 478. Moreover, the State's testimony and photographs of the house, confirming the backyard was messy with household items and debris, suggest that Garrison undertook little effort to make private his affairs outside of his house. [Citation omitted.]" *State v. Talkington*, No. 107,596, 2013 WL 1859215, at *5 (Kan. App. 2013) (unpublished opinion).

In reaching this conclusion, the panel distinguished this case from *Fisher*, 283 Kan. at 289-90 (mowed and maintained area in rural environment might be considered

enclosure where it was surrounded by barbed wire fencing on three sides and highway on fourth), and compared it to *Mell*, 39 Kan. App. 2d at 478 (marijuana plants, outside the area enclosed by a fence, plants were visible from sidewalk, and area surrounding plants was not mowed or well maintained). The panel also cited three cases which found no reasonable expectation of privacy existed when warrantless arrests were made on the front porch. See *State v. King*, 293 Kan. 1057, 1062-63, 274 P.3d 599 (2012) (front porch partially screened, easily seen through, unlocked, provided access to front door, and anyone could see or hear persons on porch); *State v. Riddle*, 246 Kan. 277, 281, 788 P.2d 266 (1990) (no expectation of privacy when arrested on porch); *State v. Orr*, No. 96,790, 2008 WL 940778, at *4 (Kan. App. 2008) (unpublished opinion) (no reasonable expectation of privacy in glassed-in porch attached to front entrance—even where State conceded porch was part of curtilage).

In this case, the baggie of methamphetamine was found just a few feet from the back porch steps. We presume the panel was citing these porch cases because of the drugs' proximity to the back porch and a comparison to the nature of the enclosure in *King* (partially screened, easy to see through) and *Orr* (glass enclosed). However, regarding proximity, the United States Supreme Court has subsequently found "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Jardines*, 133 S. Ct. at 1415.

Because the *Jardines* Court did not apply the *Dunn* factors in suppressing the evidence or consider whether Jardines had a reasonable expectation of privacy in the porch, our cases involving porches as curtilage may be decided differently under the property rights test set forth in *Jardines*.

Regarding the enclosure, Talkington argues the panel reweighed the evidence in finding the backyard was not surrounded by a tall fence blocking all visibility and was

18

not well maintained. The Court of Appeals does acknowledge the district court's factual findings concerning the existence of an alleyway bordering the west side of the property, a partial chain-link fence on the north side, and a rock wall or boundary marker on the south side. Indeed, substantial competent evidence, *i.e.*, pictures and testimony, supports this description of the enclosure.

The panel's recharacterization of the evidence concerning what the officers described as a rock wall was insignificant as its height and location were undisputed: "Also, a 1-foot-high rock boundary marker—it was described by the district court as a 'wall' even though it would be more accurately described as a boundary marker because it was so low to the ground—surrounded Garrison's house . . . ." *Talkington*, 2013 WL 1859215, at *2. In contrast, the panel's failure to address the district court's factual finding concerning the trees lining the rock wall/boundary marker is more significant because natural barriers may be considered part of an enclosure. See *United States v. Reilly*, 76 F.3d 1271, 1277-78 (2d Cir. 1996) (wire fence on three sides of land that was partially fallen down, hedgerows on two sides, and thick woods on one side satisfied enclosure requirement—no need for artificial barriers, can be natural ones).

The panel's main concern was the area was not enclosed by a tall fence and the backyard was visible through the partial fence and rock wall. While a 6-foot privacy fence would weigh in favor of curtilage as in *Waldschmidt*, 12 Kan. App. 2d at 290, "[t]here is no requirement that an area be completely invisible to those standing in the open fields in order to be deemed curtilage." *Brocuglio*, 478 F. Supp. 2d at 305 (officers could see vehicles over fence in backyard).

Additionally, "[c]ourts have found an area to be curtilage where the area in question is only partially enclosed." See *United States v. Cousins*, 455 F.3d 1116, 1122 (10th Cir.), *cert. denied* 549 U.S. 866 (2006). Indeed, two unpublished Court of Appeals

cases have also found backyards with partial or no fencing to be part of the curtilage. See *State v. Frischenmeyer*, No. 99,975, 2009 WL 400997, at \*3-4 (Kan. App. 2009) (unpublished opinion) (backyard with no fence and attached enclosed porch part of curtilage); *State v. Wilson*, No. 95,028, 2006 WL 2443710, at \*7-8 (Kan. App. 2006) (unpublished opinion) (duplex backyard with only one fence separating it from property to north and no obstructions blocking area from street part of curtilage); see also *Rivers v. State*, 287 Ga. App. 632, 634, 653 S.E.2d 78 (2007) (curtilage included hedge area adjacent to side of house even if the backyard was exposed to an alley and not enclosed by a fence).

Weighing these factual findings, the caselaw supports the district court's legal conclusion that this factor favored neither side. The ability to clearly view the backyard and its unkempt nature weighed against it being curtilage, while the fence, rock wall, and trees weighed in favor of a finding of curtilage. Accordingly, the panel exceeded its standard of review and reweighed the evidence in concluding this factor favored the State rather than being neutral.

*Nature of the Uses to Which the Area is Put*

An area is more likely to be within the curtilage of a home if it is used "'for intimate activities of the home.'" *United States v. Noriega*, 676 F.3d 1252, 1262 (11th Cir. 2012) (quoting *Dunn*, 480 U.S. at 302-03); see also *Bleavins v. Bartels*, 422 F.3d 445, 452 (7th Cir. 2005) ("Areas that are 'intimately connected with the . . . activities' of the home include, for example, backyards."). Regarding this factor, the district court found:

> "There is no testimony for this court to rely upon to determine the nature of the uses to which the area is put. However, the photos of the area show it to be relatively un-kept but otherwise a typical back yard. There are no indications the area was used for

20

outdoor entertaining, gardening or any other particular activity typically engaged in by homeowners."

The panel agreed with the district court, pointing out the backyard was messy and littered with insulation and no testimony was offered concerning uses of the backyard. Accordingly, the panel concluded this factor slightly favors the State. Substantial competent evidence from the suppression hearings and photographs of the property support the district court's factual findings, and the caselaw supports the legal conclusion that this factor weighs in favor of the State.

*Steps Taken to Protect Area from Observation by People Passing*

The district court found this factor favored Talkington, reasoning:

"Here, there is no sidewalk or path leading to the rear of the house. There are signs telling people they are not welcome on the property in the form of 'No Trespassing' and 'No Soliciting' signs. There was some effort to cover the baggie with a piece of housing insulation. While these things may not be the most effective ways to keep people from observing the area, they do show the defendant had some intent or expectation the rear of the house would be private. This factor weighs in favor of the defendant."

The Court of Appeals disagreed, reasoning:

"The front of Garrison's house had both a no-trespass sign and a no-solicitation sign that suggest his desire to maintain a sense of privacy in his house and the surrounding area. See *Fisher*, 283 Kan. at 289-90. These were key facts bolstering the district court's decision. However, the house was not fully enclosed by a tall fence, and the 1-foot-high rock boundary marker and the remnants of a chain-link fence did nothing to obstruct the view of, or prevent entrance to, the backyard. See *King*, 293 Kan. at 1062. While it is true that Doudican could not see the bag of methamphetamine from a public vantage point, the record suggests that was due to the bag being partially obscured by

21

debris—some insulation—not because of his distance from the object. This factor favors the State." *Talkington*, 2013 WL 1859215, at \*5.

Talkington takes issue with the panel's holding for three reasons. First, Talkington argues the panel dismissed Garrison's efforts at privacy by posting "No Trespass" and "No Soliciting" signs on the residence. However, the panel did observe this was a key fact bolstering the district court's decision but concluded it was outweighed by the lack of privacy fencing. See *State v. Fisher*, 283 Kan. 272, 289-90, 154 P.3d 455 (2007).

Second, Talkington persuasively argues the panel failed to acknowledge the district court's factual finding regarding the absence of a sidewalk or path leading to the backyard. This finding was significant because the lack of a sidewalk going to the area in question weighs in favor of a finding of curtilage. See *Mell*, 39 Kan. App. 2d at 479; c*f. Cousins*, 455 F.3d at 1122 (sidewalk on unenclosed area weighs against finding of curtilage); see also *Florida v. Jardines*, 569 U.S. __, 133 S. Ct. 1409, 1415-16, 185 L. Ed. 2d 495 (2013) (law enforcement officers enjoy limited invitation to approach home through ordinary routes of ingress and egress open to visitors).

Third, Talkington argues the panel ignored evidence that the officers could not determine there was contraband on the property until they entered the property and closed to a short distance from the baggie. The panel acknowledged that Deputy Doudican could not see the baggie from a public vantage point but stated "the record suggests that was due to the bag being partially obscured by debris—some insulation—not because of his distance from the object." *Talkington*, 2013 WL 1859215, at \*5. In our review of the record, Doudican testified he could not see the partially obscured object from 20 yards away. He had to enter the property and was able to identify the object only when he was 5 to 10 feet from it. Doudican did not have to move the insulation to see the baggie of methamphetamine. As this court must accept as true all inferences to be drawn from the

22

evidence which support or tend to support the findings of the district court, the panel appears to have reweighed the evidence concerning the public visibility of the baggie by stating otherwise. See *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014) (citing *State v. Walker,* 292 Kan. 1, 16, 251 P.3d 618 [2011]).

We make two additional observations. First, the fact that an effort was made to conceal the baggie between the pipe and insulation also suggests an attempt to conceal the area around the baggie. The fact that the baggie could not be seen in open view from a public vantage point favors a finding of curtilage. Contrast *Mell*, 39 Kan. App. 2d at 481 (plants in open view from public sidewalk and outside fenced enclosure weighed against curtilage finding). See also *Walschmidt*, 12 Kan. App. 2d 284, Syl. ¶ 9, 293 ("To invoke the plain view doctrine, the law enforcement officer must discover the evidence inadvertently while in a place where he has a right to be present."); *Wilson*, 2006 WL 2443710, at *8 (defendant had reasonable expectation of privacy and did not knowingly share trash can in shared backyard/driveway with public because his neighbors did not constitute the "public"). Second, the panel also stated, contrary to the district court's findings, that the rock wall and partial fence did nothing to block the view or keep people out of the backyard. *Talkington*, 2013 WL 1859215, at *6. Again, the panel failed to accept as true the inference deduced by the district court that these barriers, including the treeline, served to keep people out to some degree.

To summarize, while the lack of a privacy fence weighs somewhat in favor of the State, the no trespassing and no solicitation signs, the lack of a path leading to the backyard, the inability to see the area from a public vantage point coupled with the attempt to conceal the baggie, and the partial enclosure all weigh in favor of the district court's finding of curtilage. Accordingly, we hold the panel should have affirmed the district court's finding the factor favored Talkington.

*Considering* Dunn *Factors as a Whole*

After weighing the four factors, the district court concluded the area was part of the curtilage:

"Because the contraband was found in very close proximity to the house, because the defendant had posted signs dissuading entry upon his property and because there was some sort of barrier to be crossed to enter upon the property, this court finds the area is within the curtilage of the defendant's home and Fourth Amendment protections apply."

The Court of Appeals disagreed:

"In total, these four factors add up to the backyard not constituting part of the curtilage. While the bag of methamphetamine was found close to the back door, the State persuasively argues that the lack of enclosed fencing suggests the area was not curtilage as there was only a rock boundary marker and remnants of a chain-link fence which did nothing to obstruct the view of or access to the backyard. Moreover, the nature and uses of the backyard—admittedly there is little evidence on this point—appear to favor the State as the yard was messy and littered with insulation. While Garrison undertook some very limited efforts to assert some privacy in the front area with the placement of no trespassing and soliciting signage, the total lack of any fencing obstructing the view of or access to the backyard, coupled with the property's location in an urban area, vitiates any reasonable expectation of privacy Garrison may have had in the backyard." *Talkington*, 2013 WL 1859215, at *6.

As discussed above, the panel reweighed the evidence and failed to consider some of the factual findings relied on by the district court concerning each *Dunn* factor. These factual findings are significant because they weighed in favor of a finding of curtilage. While the panel was free to reach a de novo conclusion whether the factors individually and collectively suggested the area was curtilage, it needed to first apply a substantial

24

competent evidence standard to the district court's factual findings by accepting as true all inferences to be drawn from the evidence which support or tend to support the findings.

While the unkempt nature of the backyard, the lack of enclosed fencing, and the lack of obstructions to view the backyard may suggest the area was not curtilage, the contraband's close proximity to the back porch steps, the partial enclosure by the rock wall/treeline and chain-link fence, the no trespassing/no solicitation signs on the house, the inability to see the area from a public vantage point, and the lack of a sidewalk or path leading to the backyard weigh in favor of a finding of curtilage. Accordingly, the panel erred in reversing because the district court's findings of facts were supported by substantial competent evidence, and caselaw supports its legal conclusion that the area was curtilage.

We additionally observe that because officers garnered their information by physically intruding onto Garrison's property, we need not decide whether the officer's unlawful investigation of his curtilage violated *Garrison*'s expectation of privacy under *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). See *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409, 1417, 185 L. Ed. 2d 495 (2013); *United States v. Perea-Rey*, 680 F.3d 1179, 1186 (9th Cir. 2012) (once carport was identified as part of curtilage under the *Dunn* factors, it was unnecessary to consider whether defendant had reasonable expectation of privacy in carport). However, the question remains whether Talkington, as a social guest of Garrison, must demonstrate his own reasonable expectation of privacy in order to challenge the unlawful search of his host's curtilage.

DOES A SOCIAL GUEST HAVE STANDING TO CHALLENGE A SEARCH OF THE CURTILAGE OF THE HOST'S RESIDENCE?

*Preservation Issue*

As we have concluded the officer unlawfully searched the curtilage, the question of a social guest's standing to challenge an unlawful search of the curtilage is once again relevant. However a preservation problem arises because this issue was raised by the State below, was found moot by the Court of Appeals, and was not raised in Talkington's petition for review. Under Supreme Court Rule 8.03(h)(1) (2014 Kan. Ct. R. Annot. 77), a party must allege that an issue was decided erroneously by the Court of Appeals in order for the issue to be properly before the Supreme Court on petition for review. *State v. Allen*, 293 Kan. 793, 795-96, 268 P.3d 1198 (2012). The State could not appeal this issue because only a party that is "aggrieved by a decision of the Court of Appeals" is eligible to file a petition for review. Rule 8.03(a) (2014 Kan. Ct. R. Annot. 77).

However, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" See *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S. Ct. 421, 58 L. Ed. 2d 387 [1978]). As this issue was raised below and may be considered part and parcel of the Fourth Amendment analysis, *i.e.*, whether the area was curtilage and Talkington had a reasonable, subjective expectation of privacy in it, we elect to consider the issue rather than remanding to the Court of Appeals. See *State v. Johnson*, 299 Kan. 890, 892-93, 327 P.3d 421 (2014) (if party's arguments to district court were sufficiently broad to encompass his or her appellate arguments, we will consider them for first time on appeal).

Before the district court, Talkington testified that he had known Garrison for 7 to 8 years and had been to the house numerous times to visit. Photographs of the backyard depict a brick driveway running alongside the south rock wall. Doudican testified that there was a car in the backyard that day, and Talkington testified that he would work on vehicles and mopeds sometimes when he visited Garrison. When asked where they would work on vehicles, Talkington responded: "There was a car in the backyard, a Thunderbird, I'd helped him work on it before." Talkington would visit whenever he was in town, and he had last visited the week before the facts of this case occurred. On this day, he had come to visit around 12:30 to 1, and the officers arrived around 4:30 p.m.

Before the district court, the State conceded that Talkington was a social guest of Garrison, who owned the residence. Kansas law provides that social guests have standing to assert a reasonable, subjective expectation of privacy that their host has in his or her residence, and the district court focused on whether a social guest had standing to challenge a search of the host residence's curtilage or simply the residence itself. See *State v. Huff*, 278 Kan. 214, 222, 92 P.3d 604 (2004). As the question of whether a social guest has standing to challenge a search of his or her host's curtilage is an issue of first impression in Kansas, the parties urged reliance on the following cases from other jurisdictions.

Talkington relied on *State v. Cuntapay*, 104 Hawaii 109, 85 P.3d 634 (2004), where officers approached several males playing cards in a garage looking for the subject of a warrant. Cuntapay walked away into an open washroom in the garage and reached behind a washing machine. An officer followed him, moved the washing machine, and discovered a magnetic box containing methamphetamine. The Hawaii Supreme Court upheld the suppression of the evidence relying in large part on the dissent in *Carter*, 525

U.S. at 106 (Ginsburg, J., dissenting). The *Cuntapay* court suppressed the evidence reasoning he had "demonstrated a subjective right to privacy when he walked out of the open garage, into the separate washroom and placed the key holder behind the washing machine, in a secluded location." 104 Hawaii at 117. Additionally, "society would recognize a guest's right to privacy in his host's washroom as reasonable." 104 Hawaii at 117.

The State relied on two cases. In *United State v. Haynes*, 108 Fed. Appx. 372 (6th Cir. 2004), police approached the defendant and two others sitting at a picnic table in the back or side yard of a friend's residence. Before approaching the officers, the defendant threw a gun behind the tire of a nearby car and was subsequently arrested. On appeal the Sixth Circuit rejected his argument that he had a reasonable expectation of privacy in the yard as a social guest. The court reasoned he failed to show any meaningful connection to the residence where he was only in town for 3 days and knew the friend only by his nickname. 108 Fed. Appx. at 374-75. In a footnote, the court noted that since the defendant personally did not have an expectation of privacy in the yard, it did not address whether anyone could have an expectation of privacy in the yard, *i.e.*, whether the yard was curtilage. 108 Fed. Appx. 375 n.2.

In *United States v. Maestas*, 639 F.3d 1032 (10th Cir. 2011), Maestas hid drugs and a gun in an outside garbage storage area which was shared by triplex residents. The Tenth Circuit assumed without deciding that Maestas was a social or overnight guest at his host's residence noting that it did not necessarily resolve whether Maestas, standing in the shoes of the tenant (his host), had a reasonable expectation of privacy in the garbage storage area adjacent to the triplex. The court held that even if it assumed the area was curtilage, Maestas had no reasonable expectation of privacy in the area which was used to store garbage and was shared with other tenants who did not have a special or familial relationship with the host. 639 F.3d at 1039-40.

After examining these cases, the district court concluded:

"Talkington has established to this court's satisfaction that he was a 'social guest' entitled to an expectation of privacy enjoyed by his host. This court has previously found the area in which the methamphetamine was found was within the curtilage of the property located at 109 S. State. The state has the burden to show either by fact or by law that evidence should not be suppressed. No case law has been presented to the court establishing under these facts that Mr. Talkington, as a social guest, had no right to privacy. Therefore, the evidence found at 109 S. State is suppressed."

Before the Court of Appeals, the State argued the district court improperly required the State to provide authority that Talkington had no right to privacy. Relying again on *Haynes* and *Maestas*, the State asserted that the district court erred in determining that Talkington, as a social guest of Garrison, had the same expectation of privacy in a backyard in open view that he would have enjoyed inside Garrison's home. Talkington argued that as a social guest, he had standing to assert Garrison's reasonable expectation of privacy in the curtilage of his residence. The Court of Appeals found this issue was moot because it had concluded that Garrison had no reasonable expectation of privacy in his backyard. *State v. Talkington*, No. 107,596, 2013 WL 1859215, at *6 (Kan. App. 2013) (unpublished opinion).

*Standard of Review*

"[A] defendant cannot object to the seizure of evidence without proper standing to challenge the validity of the search. On the issue of standing, the burden is on the defendant to show an expectation of privacy in the property searched. A defendant may testify at a suppression hearing to establish his or her standing to challenge a search without jeopardizing his or her defense at trial." *State v. Gonzalez*, 32 Kan. App. 2d 590, 593, 85 P.3d 711 (2004).

29

Once standing is established, the State bears the burden on a motion to suppress of proving to the district court the lawfulness of the search and seizure by a preponderance of the evidence. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

*Analysis*

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Fourth Amendment "standing" refers to whether the party challenging a search or seizure personally has a legitimate expectation of privacy that was implicated by the challenged governmental action. *United States v. Thomas*, 372 F.3d 1173, 1176 (10th Cir. 2004).

Fourth Amendment rights are personal rights that may not be vicariously asserted. *Rakas*, 439 U.S. at 133-34. "'A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" See *United States v. Rojas*, ___ F. Supp. 3d ___, No. CR14-4015-MWB, 2014 WL 5106330, at *6 (N.D. Iowa 2014) (quoting *Rakas*, 439 U.S. at 134).

Recently, the Northern District of Oklahoma explained that the trespass doctrine enunciated in *Jardines* requires an existing constitutional property interest which social guests do not possess. *United States v. Owen*, ___ F. Supp. 3d ___, No. 14-CR-0162-CVE, 2014 WL 6750647, at *4-5 (N.D. Okla. 2014). As a social guest lacks the requisite property right in a residence or its curtilage, the court held social guests must have a reasonable expectation of privacy in the residence, under United States Supreme Court and Tenth Circuit social guest caselaw, in order to assert their Fourth Amendment rights.

30

2014 WL 6750647, at *4-5. See also Caskey, Cal. Search & Seizure § 2:14 Search in the curtilage; *Jardines* (2014) (to assert standing to challenge search of curtilage best approach is based upon expectation of privacy analysis).

"The general rule in Kansas is that an individual must have a personal expectation of privacy in the area searched to have standing to challenge that search." *Gonzalez*, 32 Kan. App. 2d at 593 (citing *State v. Bartlett*, 27 Kan. App. 2d 143, 146, 999 P.2d 274 [2000]). To establish a legitimate expectation of privacy, a defendant must demonstrate a subjective expectation of privacy in the area searched and that the expectation was objectively reasonable. *State v. Robinson*, 293 Kan. 1002, 1014, 270 P.3d 1183 (2012).

"Where the subjective expectation of privacy *and* its objective reasonableness are both well established (for example, in a defendant's home), courts tend to state the conclusion of the analysis without distinguishing the two steps." *State v. Case*, No. 109,339, 2014 WL 349605, at *7 (Kan. App. 2014) (unpublished opinion); see *Maestas*, 639 F.3d at 1035 ("Under the Fourth Amendment, it is axiomatic that people have a reasonable expectation of privacy in their own homes.").

The "status as an overnight guest is alone enough to show that [the guest] had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 96-97, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); see also *Porting*, 281 Kan. at 324-28 (overnight guest had expectation of privacy and standing to object to search of residence); *State v. Yardley*, 267 Kan. 37, 41, 978 P.2d 886 (1999) (overnight guest had standing to challenge seizure of his duffle bag during search of residence where staying ); *State v. Martinez*, No. 107,995, 2013 WL 5925903, at *4 (Kan. App. 2013) (unpublished opinion) (overnight guest had standing under Fourth Amendment to challenge search uncovering marijuana in bedroom he shared with renter of the house because he plainly had legitimate expectation of privacy in bedroom and

likely as to entire residence); c*f. State v. Gonzalez*, 32 Kan. App. 2d 590, Syl. ¶ 4 ("A person cannot establish a reasonable expectation of privacy in a hotel or motel room which is registered to another person absent a showing of a relationship with the registered guest.").

In *Carter*, the United States Supreme Court observed that persons at an apartment for the purpose of packaging drugs did not have the same legitimate expectation of privacy as an overnight guest, reasoning:

> "If we regard the overnight guest in *Minnesota v. Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely 'legitimately on the premises' as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises." 525 U.S. at 91.

Further guidance is gleaned from Justice Ginsburg's often cited dissent in *Carter*: "[W]hen a homeowner or lessee personally invites a guest into her home to share in a common endeavor, whether it be for conversation, to engage in leisure activities, or for business purposes licit or illicit, that guest should share his host's shelter against unreasonable searches and seizures." 525 U.S. at 106 (Ginsburg, J., dissenting). She warned "that today's decision will tempt police to pry into private dwellings without warrant, to find evidence incriminating guests who do not rest there through the night." 525 U.S. at 108 (Ginsburg, J., dissenting).

Justice Ginsburg continued that "[t]hrough the host's invitation, the guest gains a reasonable expectation of privacy in the home. [*Olson*, 495 U.S. 91], so held with respect

32

to an overnight guest. The logic of that decision extends to shorter term guests as well. [Citation omitted.] Visiting the home of a friend, relative, or business associate, whatever the time of day, 'serves functions recognized as valuable by society.' [Citation omitted.]" 525 U.S. at 108-09. She concluded: "[W]hen a homeowner chooses to share the privacy of her home and her company with a short-term guest, the twofold requirement 'emerg[ing] from prior decisions' has been satisfied: Both host and guest 'have exhibited an actual (subjective) expectation of privacy'; that 'expectation [is] one [our] society is prepared to recognize as "reasonable."'" 525 U.S. at 109 (quoting *Katz*, 389 U.S. at 361 [Harlan, J., concurring]).

"[E]ven social guests who do not stay the night have a reasonable expectation of privacy in the host's home and may therefore challenge a search of the home on Fourth Amendment grounds." *Thomas*, 372 F.3d at 1176 (nephew planning to sleep at relative's apartment on New Year's Eve considered social guest). According to the Tenth Circuit, a social guest must show a "'degree of acceptance into the household'" or an "'ongoing and meaningful connection to [the host's] home'" to qualify for protection under the Fourth Amendment. *United State v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009) (ex-boyfriend and former resident who visited often, had a key, invited guests in, and left alone without homeowner qualified as social guest) (quoting *United States v. Rhiger*, 315 F.3d 1283, 1286-87 [10th Cir. 2003] [relying on *Carter* dissent in finding social guest status where he had known host for about 2 weeks, had regular presence at the home, stayed overnight at the house on few occasions when he was too intoxicated to drive, had receipts in house for items he had purchased, and entered residence unannounced to take nap]).

Talkington's situation clearly falls somewhere in between an overnight guest and someone "merely 'legitimately on the premises.'" *Carter*, 525 U.S. at 91. Applying the *Carter* factors, no evidence was presented that Talkington and Garrison were involved in a commercial transaction. Talkington had been at the house for a few hours that afternoon

33

when the officers had arrived. Talkington and Garrison had been friends for 7 to 8 years, they worked on cars and mopeds together, and Talkington visited whenever he was in town, including the previous week. Accordingly, Talkington is entitled to Fourth Amendment protections under this analysis. Likewise applying Tenth Circuit analysis, Talkington establishes a "'degree of acceptance into the household'" and an "'ongoing and meaningful connection to [the host's] home'" by virtue of his 7- to 8-year relationship with Garrison, their working on vehicles together, and his regularly visiting whenever he was in town. See *Poe*, 556 F.3d at 1122.

In 2004, we upheld the suppression of evidence after officers conducted an unlawful protective sweep of an apartment with several occupants inside, reasoning that "[s]ocial guests have standing to assert a reasonable, subjective expectation of privacy that their host has in his or her residence." *Huff*, 278 Kan. 214, Syl. ¶ 6. Assuming Talkington was a social guest with a reasonable expectation of privacy in the residence under United States and Tenth Circuit caselaw, no published Kansas cases have specifically considered whether a social guest has standing to challenge a search in the curtilage of his or her host's residence. In the absence of binding authority on this issue, we find it helpful to look at two unpublished Court of Appeals cases.

In *State v. Meeks*, No. 90,782, 2005 WL 2076458, at *4 (Kan. App. 2005) (unpublished opinion)*, rev. denied* 281 Kan. 1381 (2006), the Court of Appeals applied *Huff* in summarily concluding that a social guest did not have standing to object to a search, reasoning that even if he "had an expectation of privacy in the residence where he was staying, this expectation did not reasonably extend to the detached, padlocked garage." The *Meeks* panel did not extend the social guest's expectation of privacy as far as his host's expectation of privacy. In other words, it truly was not the social guest "standing in the shoes" of his host in making the reasonable expectation of privacy determination described by the Tenth Circuit. See *Maestas*, 639 F.3d at 1036.

34

In *State v. Hawkins*, No. 92,705, 2005 WL 217179 (Kan. App. 2005) (unpublished opinion), Hawkins was arrested in a shed being used as a methamphetamine lab 30 to 40 yards from the residence on a rural property owned by Davis, and his standing to challenge the warrantless entry was raised on appeal. The panel did not address *Huff* in its analysis. Rather, it applied the *Carter* factors and found Hawkins had a reasonable expectation of privacy in the shed and standing to challenge the search because Hawkins and Davis worked together buying old cars, they repaired them in Davis' outbuildings, Hawkins kept tools on the property, and he had access to the shed and whole residence. Additionally, the panel found it significant that Hawkins had the ability to exclude others from the shed, citing *Bartlett*, 27 Kan. App. 2d at 147 (vehicle owner challenging the search of a loaned vehicle). *Hawkins*, 2005 WL 217179, at *4.

Again, this case falls somewhere in between *Meeks* and *Hawkins*. Although the *Meeks* court did not extend the social guest's expectation of privacy to a padlocked garage, these facts are distinguishable because Talkington was clearly authorized to use the backyard. He and Garrison regularly worked on the car in the backyard, and they were tending to their dogs in the side and backyard when officers approached. Although no evidence was presented concerning his ability to exclude others or keeping tools on the residence, this case falls more in line with *Hawkins* where they likewise worked on cars on the host's property.

We note that other jurisdictions have attributed a reasonable expectation of privacy to an overnight guest in the backyard or curtilage. See *United States v. Houston*, 3:13-09-DCR, 2014 WL 259085, at *3 (E.D. Tenn. 2014) (unpublished opinion) (overnight guest with familial relationship has standing to challenge video surveillance of his brother's curtilage); *Lafave v. State*, No. 16A01-1006-CR-271, 2010 WL 5395673, at *4 (Ind. App. 2010) (unpublished opinion) (overnight guest at underage drinking party

35

had reasonable expectation of privacy in home after officers unlawfully entered backyard which was part of curtilage). But see *United States v. Butler*, 06-CR-215, 2007 WL 2220260, at *7 (E.D. Wis. 2007) (unpublished opinion) (although overnight guest had standing to object to search in his host's backyard, he did not have reasonable expectation of privacy in backyard because "[c]ommon sense dictates that a shared backyard would not fall within an area of privacy where an overnight guest could have an expectation of privacy").

Likewise, other jurisdictions vary when attributing a reasonable expectation of privacy in the backyard to a social guest. See, *e.g.*, *United States v. Dubose*, No. 05-0372(JDB), 2006 WL 1876999, at *8-9 (D.D.C. 2006) (unpublished opinion) (defendant who regularly visited and left belongings at his mother's house had reasonable expectation of privacy in his mother's backyard where he parked his car). But see *State ex rel. K.M.K.*, No. 20010774-CA, 2002 WL 31600692, at *1-2 (Ut. App. 2002) (unpublished opinion) (where defendant was merely guest at backyard party with no ownership or control of the home, he has no standing to assert legitimate privacy interest).

We find *State v. Pierce*, 226 Or. App. 336, 203 P.3d 343 (2009), the most analogous of these cases to our factual scenario. In *Pierce*, officers responding to a noise complaint walked down a driveway past the front of the house to a chain-link fence and observed Pierce, who was a social guest of the homeowner, in the backyard trying to conceal marijuana plants. Pierce moved to suppress the evidence as an unlawful search of his host's backyard, and the Oregon Court of Appeals agreed, noting in a footnote: "It is not disputed that defendant, who was a guest at [homeowner's] house and was authorized to use [homeowner's] garage, had a protected privacy interest in the curtilage of [homeowner's] residence." 226 Or. App. at 339 n.2. Likewise in this case, Talkington was

36

a guest of Garrison, was authorized to use the yard, and the officer encroached on the curtilage to observe contraband hidden by the defendant in the backyard.

We find the caselaw attributing a reasonable expectation of privacy to the backyard or curtilage more persuasive. As the curtilage is treated as "'part of the home itself for Fourth Amendment purposes,'" *Florida v. Jardines*, 569 U.S. __, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d 495 (2013), a social guest standing in the shoes of his or her host has standing to assert a reasonable, subjective expectation of privacy in the residence, which includes the curtilage.

Accordingly, we hold Talkington has a reasonable expectation of privacy as a social guest in his host's residence under both the *Carter* factors and the Tenth Circuit's "'degree of acceptance into the household'" or an "'ongoing and meaningful connection to [the host's] home'" analysis. *Poe*, 556 F.3d at 1122. Considering whether the backyard falls under this protection, this case is more analogous to *Hawkins* (shed) and *Pierce* (hiding marijuana in backyard) than *Meeks* (locked detached garage) because Talkington's relationship with Garrison included authorization to be in Garrison's backyard. As Talkington has demonstrated that he was entitled to Fourth Amendment protections afforded his host as a social guest, he has also demonstrated standing to assert a reasonable, subjective expectation of privacy in the backyard, *i.e.*, curtilage, of his host's residence. See *Huff*, 278 Kan. 214, Syl. ¶ 6.

WAS MARIJUANA FOUND ON TALKINGTON FOLLOWING HIS ARREST FRUIT OF THE
POISONOUS TREE?

*Standard of Review*

The factual underpinnings regarding a motion to suppress are reviewed for substantial competent evidence, but the legal conclusion drawn from those facts is reviewed de novo. *State v. Campbell*, 297 Kan. 273, 279, 300 P.3d 72 (2013).

"Whether the taint of a prior illegality has been purged by sufficient attenuation between the unlawful conduct and the discovery of the challenged evidence is a question of fact we review under a substantial competent evidence standard." *State v. Williams*, 297 Kan. 370, 382, 300 P.3d 1072 (2013).

*Analysis*

After correctly concluding the search of the backyard was unlawful, the district court found the marijuana found on the defendant following his arrest should be suppressed as fruit of the poisonous tree. The Court of Appeals reversed, reasoning that because the search of the backyard and Talkington's arrest were lawful, the search of his person when being booked into jail was also lawful. *Talkington*, 2013 WL 1859215, at *7 (citing *State v. Copridge*, 260 Kan. 19, 23, 918 P.2d 1247 [1996] [defendant taken into custody may have personal effects lawfully seized]). As we have reversed the Court of Appeals' conclusion that the search was lawful, our analysis turns to whether the district court properly suppressed the marijuana.

When the State fails to demonstrate the lawfulness of a challenged search or seizure, the evidence obtained in violation of the defendant's rights under the Fourth Amendment may be suppressed through application of the exclusionary rule. *Williams*,

297 Kan. at 380. One exception to the exclusionary rule is the doctrine of attenuation, which provides "'the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated.'" 297 Kan. at 381 (quoting *State v. Martin,* 285 Kan. 994, 1003, 179 P.3d 457 [2008]).

"When evidence '"would not have come to light but for the illegal actions of the police,"' the relevant question is whether the allegedly tainted evidence was discovered through '"exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."'" 297 Kan. at 381 (citing *Brown v. Illinois,* 422 U.S. 590, 599, 95 S. Ct. 2254, 45 L. Ed. 2d 416 [1975]).

In determining whether law enforcement officers obtained allegedly tainted evidence through exploitation of an illegality, the following factors are considered:

> "(1) the time that elapsed between the illegality and the acquisition of the evidence sought to be suppressed, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. [Citations omitted.] But no one factor is controlling, and other factors also may be relevant to the attenuation analysis." *Williams*, 297 Kan. at 381.

The district court applied these factors in determining whether the primary illegal search of the curtilage was so attenuated from the arrest and search of Talkington so as to purge the primary taint. Before the Court of Appeals, the State mistakenly focused on whether *Miranda* rights were given; however, this additional factor is only relevant when a confession is given following an unlawful arrest. See *State v. Hill*, 281 Kan. 136, 153, 130 P.3d 1 (2006).

39

The first factor considers the time elapsed between the illegality and acquisition of the evidence sought to be suppressed. See *Williams*, 297 Kan. at 381. The district court found the arrest occurred just a few minutes after the illegal search. Doudican called for assistance after finding the methamphetamine in the backyard. One of those officers transported Talkington to the jail where marijuana was found on his person. The district court concluded this all occurred within a short time of the illegal search.

At the suppression hearing, Doudican testified that they arrived at the residence around 4:30 p.m., and Detention Officer Tyler Pettigrew testified that Talkington arrived at the jail around 4:50 p.m. and his property was inventoried. See *State v. Moralez*, 297 Kan. 397, 417, 300 P.3d 1090 (2013) (factor weighs heavily in favor of suppression because discovery of challenged evidence occurred within 16 minutes of Moralez' initial contact with officers); see also *Hill*, 281 Kan. at 154 (9 hours in police custody between unlawful arrest and interrogation weighs in favor of suppression). Given the very short period of time between the unlawful search and arrest, substantial competent evidence supports the district court's finding this factor weighs in favor of suppression.

The second factor considers whether intervening circumstances occurred between the unlawful conduct and the discovery of the evidence. See *Williams*, 297 Kan. at 381. The district court found no intervening circumstances occurred between the arrest and Talkington's transportation to jail. Before the Court of Appeals, the State argued, without citing any authority, that the discovery of marijuana by jail officials who were not commissioned law enforcement officers and who perform ministerial duties unrelated to the events that led to the defendant's presence at the jail constitutes an intervening factor leading to attenuation of the taint of the search.

We find this argument unpersuasive. Pettigrew and Rustan Dirks testified that they were detention officers employed by the Lyon County Jail and their duties included

40

supervision of inmates, detention of inmates, welfare, transporting prisoners, and inventory searches. See *State v. Payne*, 273 Kan. 466, 476, 44 P.3d 419 (2002) (defendant has no expectation of privacy when personal effects are lawfully seized and retained for safekeeping). A law enforcement officer brought Talkington to the jail, Dirks conducted an inventory search, and Pettigrew was advised to contact the arresting officer. Talkington continued to be in police custody at the jail when the custodial inventory search was performed by the detention officers. See *Hill*, 281 Kan. at 154 (no intervening circumstances during 9 hours of police custody).

The State also argued that even if the entry into the backyard and discovery of methamphetamine was unlawful, its discovery, coupled with his running, provided probable cause to arrest Talkington. The State relied on *State v. Boster*, 4 Kan. App. 2d 355, 606 P.2d 1035 (1980), in arguing the existence of probable cause for arrest is separate and distinct from the validity of the search that produced the evidence under the Fourth Amendment. But see *Boster*, 4 Kan. App. 2d at 357 (quoting *State v. Addington*, 205 Kan. 640, 645, 472 P.2d 225 [1970]) ("'Unless a defendant's substantial rights are prejudiced as a direct result of an unlawful arrest, *such as the use of evidence seized at the time*, his arrest will not vitiate his subsequent conviction.'") (Emphasis added.).

In this case, Doudican testified that Talkington ran to the backyard briefly. This was suspicious behavior. However, "courts have consistently recognized an individual's furtiveness or flight as contributing to reasonable suspicion, though not demonstrating probable cause." *State v. Beltran*, 48 Kan. App. 2d 857, 869-70, 300 P.3d 92, *rev. denied* 298 Kan. __ (2013). In *Beltran*, a social guest's evasive action, walking to the kitchen against police directives, grabbing something from a table where marijuana was subsequently found, and putting it in his pocket, did not establish probable cause but at most reasonable suspicion of criminal activity. 48 Kan. App. 2d at 874-75; see also *State v. Beaver*, 41 Kan. App. 2d 124, Syl. ¶ 6, 200 P.3d 490 (2009) (social guest's mere

presence in home and proximity to illicit drugs were insufficient to show probable cause to believe that defendant was in constructive possession of illicit drugs).

Doudican did not see Talkington violate any law or throw anything to the ground; also he did not observe any weapons. Talkington denied knowing anything about the baggie, he was a social guest, and he did not know the person they were looking to arrest. Under these facts, the State has not established the officers had probable cause to arrest following the unlawful entry into the backyard. As the State has failed to establish any intervening circumstances representing a "potential break in the causal chain between the unlawful conduct" and the inventory search, this factor weighs in favor of suppression. See *State v. Martin*, 285 Kan. 994, 1004, 179 P.3d 457 (2008).

The third factor considers the purpose and flagrancy of the official misconduct. See *Williams*, 297 Kan. at 381. This factor focuses on the primary purpose of the exclusionary rule—deterrence. *Moralez*, 297 Kan. at 418. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009). Factors that may be important to this inquiry are "'an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent.'" *Moralez*, 297 Kan. at 416 (quoting *State v. Hummons*, 227 Ariz. 78, 81-82, 253 P.3d 275 [2011]).

The district court stated Doudican may have had legitimate reasons to enter the property, *i.e.*, to look for Matthew Tucker (the subject of the arrest warrant) and to see if Talkington or Garrison had left any weapons in the back of the house to ambush the officers. However, the reasons were insufficient to obviate the need for a search warrant or consent to search. The court found Doudican's conduct was not extremely flagrant since no evidence established he was searching for any contraband or evidence to be used

42

against Talkington or Garrison. Additionally, the extent to which the curtilage reached was not obvious as demonstrated by the split of opinion between the district court and the Court of Appeals.

We agree with the district court's reasoning that the marijuana should be suppressed as fruit of the poisonous tree: "Although the purpose and flagrancy of the officers actions lean towards attenuation, the short time lapse and lack of intervening circumstances causes the court to conclude there is insufficient attenuation." Substantial competent evidence supports the district court's conclusion there was insufficient attenuation between the unlawful entry into the backyard and arrest and the discovery of marijuana on his person during an inventory search at the jail.

The decision of the Court of Appeals is reversed. The district court is affirmed.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 107,596 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.