IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,981

STATE OF KANSAS,
*Appellant*,

v.

BRANDON ALVIN DANNEBOHM,
*Appellee.*

SYLLABUS BY THE COURT

1.

When a defendant's standing to challenge a search is in question, the burden falls on the defendant to show an expectation of privacy in the property searched. Defendants may testify at a suppression hearing to establish their standing to challenge a search without jeopardizing their defense at trial.

2.

To have standing to challenge a home search, a guest must show a degree of acceptance into the household or an ongoing and meaningful connection to the host's residence so that the guest has a reasonable expectation of privacy in the host's residence.

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 11, 2017. Appeal from Barton District Court; RON SVATY, judge. Opinion filed July 6, 2018. Judgment of the Court of Appeals reversing the district court is reversed. The case is remanded to the Court of Appeals with directions.

*Douglas A. Matthews*, assistant county attorney, argued the cause, and *Amy J. Mellor*, county attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellant.

*Donald E. Anderson II*, of Anderson, Bristow, & Anderson Law Office, of Ellinwood, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  Law enforcement officers searched Alexis Tracy's apartment for Brandon Alvin Dannebohm but did not find him. Instead, they found his safe, which contained 447.5 grams of methamphetamine. Dannebohm moved to suppress this evidence. But the State argued Dannebohm lacked standing to challenge the search because the apartment was not his and he did not live there.

The district court at first agreed with the State, but upon reconsideration, it found Dannebohm had standing and went on to suppress the evidence. The State filed an interlocutory appeal, and our Court of Appeals reversed, holding Dannebohm lacked standing. We disagree. Dannebohm had a reasonable expectation of privacy in Tracy's apartment at the time of the search, so he has standing to challenge the search. We thus reverse and remand this appeal to the Court of Appeals so it can rule on the merits of the State's appeal.

FACTUAL AND PROCEDURAL BACKGROUND

On June 23, 2015, officers Chance Bailey and Jacob Harlow of the Ellinwood Police Department were searching for Dannebohm who had an outstanding arrest warrant. That evening, law enforcement received a tip that Dannebohm was at Tracy's apartment in Ellinwood. In fact, Dannebohm had arrived at Tracy's apartment that morning carrying a blue cooler as Tracy was leaving to run errands.

No one was present at Tracy's apartment when the officers arrived. Eventually, the apartment manager helped Officer Harlow get in touch with Tracy over the phone. He

told Tracy they were looking for Dannebohm and believed he was inside her apartment. Tracy—who was in Great Bend—said Dannebohm was not there. She said she was driving home. Tracy did not mention that Dannebohm was with her in the vehicle at the time of the call. Afterwards, she dropped him off at her mother's house and returned to Ellinwood.

Once she arrived, Tracy told the officers she was "pretty sure" there was nobody in her apartment. Officer Harlow testified that Tracy said Dannebohm had been there earlier that day but "she didn't believe he was still there." Officer Harlow still asked Tracy for her consent to search the apartment for Dannebohm, and she assented. Tracy remained outside with Officer Bailey while other officers—along with a police dog—searched the apartment. Dannebohm was not inside. But resting on a bed was "a glass pipe with white and burnt residue." In the same room was a black Sentry safe being used as a TV stand. Tracy said the safe belonged to Dannebohm. Also in the room was the same blue cooler Dannebohm carried into the house that morning. Somewhere in the apartment the officers found a duffel bag containing clothing that evidently belonged to Dannebohm.

At some point, the dog alerted to the presence of drugs on the bed near the pipe. It also detected the presence of drugs on the safe. The officers seized the pipe and the safe but not the duffle bag. Rather than trying to open the safe, they took it to the police department where they placed it in an evidence locker. After obtaining a warrant, the officers opened the safe using the combination (which they already possessed because they had dealt with the same safe in a prior case). Inside was a warrant and bonding information for Dannebohm as well as 447.5 grams of methamphetamine.

Tracy said Dannebohm brought the safe to her apartment sometime before June 9, 2015. Before the search, she told the officers that if there were drugs in the safe, they belonged to Dannebohm and not her. Tracy stored no personal items in the safe. When asked if she could access its contents, she responded, "I'm pretty sure the PIN was written

3

down somewhere but, I mean, I never really got into it." She said the safe was occasionally left open.

The State charged Dannebohm with possession with intent to distribute methamphetamine and no drug tax stamp. Before trial, he moved to suppress the evidence because he believed the search with the dog exceeded the scope of Tracy's consent. But before the court considered the merits of Dannebohm's claim, the State moved to dismiss his motion, arguing he lacked standing to challenge the search because he had no reasonable expectation of privacy in Tracy's apartment.

The district court conducted a bifurcated evidentiary hearing on the motion to dismiss. Tracy testified she had known Dannebohm for about 10 years. She and Dannebohm had no romantic relationship. Tracy thought of him as a brother. That summer Dannebohm was at her apartment at least once a day to check on her because she was pregnant. Tracy considered Dannebohm a welcomed guest. When asked if Dannebohm would ever stay the night, she answered, "Maybe once or twice." Tracy let him keep some clothes and "other things" at the residence. Tracy also permitted Dannebohm to be at the apartment when she was not there.

At the same time, Tracy stated on cross-examination that she was the only person on the lease. Dannebohm paid no portion of the rent, utilities, or food. He had no key to the apartment, and Tracy typically locked the door when she left. She did not believe Dannebohm listed her apartment as his address.

Dannebohm testified he had been a friend of Tracy's family for 15 years and he had known Tracy most of her life. At the time of the arrest, Dannebohm lived at a house north of Great Bend. He kept some clothes at Tracy's apartment and would at times sleep on the couch for a few hours. When asked whether he had ever stayed the night with her that summer, he responded, "Not that I recall. I might have but wouldn't have been like

all night, you know. I probably fell asleep over there for a couple two, three hours or whatever and left. . . . . She'd cook[] supper and I would eat and fall asleep and leave." Dannebohm said he came and went from the apartment in June 2015 because Dannebohm was pregnant, and he was checking on her. For a two-week period, he was at the apartment daily to bring her items she requested. Sometimes Tracy would meet him at his vehicle, and Dannebohm would not come inside.

Officer Harlow testified he did not think anyone other than Tracy and her newborn child lived at the apartment. Officer Bailey—who had responded to a call on a separate incident at Tracy's apartment—knew Tracy resided at the apartment. Neither Officer Harlow nor Officer Bailey saw Dannebohm staying at the apartment.

The State argued Dannebohm could not show he had standing to request suppression of the evidence. In doing so, it emphasized that he did not reside at the apartment nor did he stay overnight. Dannebohm contended that because he was an ongoing welcomed guest, he had a reasonable expectation of privacy in Tracy's apartment. In rebuttal, the State posited that even if Dannebohm was a social guest, he was absent at the time of the search. This, according to the State, is what the legality of the search "hinged" on. The court agreed that the issue was whether Dannebohm was present at the time of the search. It ultimately granted the motion to dismiss, stating "I think this is, frankly, a gray area, and this is one way to get it resolved. . . . Because I think the issue is whether the person's there or not, especially in a search of an apartment or a living complex."

Dannebohm later asked the court to reconsider, citing additional federal caselaw. And in November 2016, the court heard arguments on the motion. The district court judge began by stating that he had read *Minnesota v. Olson*, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990), in its entirety and as a result had changed his mind. The court found it significant that Dannebohm napped at the apartment, kept some clothing there,

and was a welcomed guest. Ultimately, the judge held Dannebohm had standing to challenge the search. He then proceeded to grant the motion to suppress, finding the application for a search warrant to search the safe was based on the dog's sniff of the safe, which exceeded the scope of consent. The State filed an interlocutory appeal challenging both the lower court's standing ruling and its ruling on the merits of the motion to suppress.

A panel of our Court of Appeals reversed solely on standing. *State v. Dannebohm*, No. 116,981, 2017 WL 3447883 (Kan. App. 2017) (unpublished opinion). In doing so, it acknowledged Dannebohm was a welcomed social guest at Tracy's apartment, but—as the panel reasoned—because he was not present at the time of the search, he was not a *current* guest. 2017 WL 3447883, at *5-6. The panel also held Dannebohm's connection to the apartment was "not so extensive that he had a reasonable expectation of privacy in the apartment even when he was not currently a guest." 2017 WL 3447883, at *6. The panel's holding mooted any discussion of whether the district court erred in suppressing the evidence. 2017 WL 3447883, at *6.

We granted Dannebohm's petition for review. Our jurisdiction is proper. See K.S.A. 60-2101(b) ("[A]ny decision of the court of appeals shall be subject to review by the supreme court.").

ANALYSIS

*Dannebohm had a reasonable expectation of privacy in Tracy's apartment.*

The only question for us is whether Dannebohm had standing to challenge the search of Tracy's apartment.

6

"'[A] defendant cannot object to the seizure of evidence without proper standing to challenge the validity of the search. On the issue of standing, the burden is on the defendant to show an expectation of privacy in the property searched. A defendant may testify at a suppression hearing to establish his or her standing to challenge a search without jeopardizing his or her defense at trial.'" *State v. Talkington*, 301 Kan. 453, 476, 345 P.3d 258 (2015) (quoting *State v. Gonzalez*, 32 Kan. App. 2d 590, 593, 85 P.3d 711 [2004]).

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *State v. Ryce*, 303 Kan. 899, 909, 368 P.3d 342 (2016), *aff'd on reh'g* 306 Kan. 682, 396 P.3d 711 (2017). Section 15 of the Kansas Constitution Bill of Rights provides the same protections. 309 Kan. at 909; see *State v. Zwickl*, 306 Kan. 286, 291, 393 P.3d 621 (2017) (stating this court could extend Section 15's protections beyond the federal guarantees provided by the Fourth Amendment but has not yet done so). These rights are personal, and defendants may not vicariously assert them. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

Traditionally, to claim Fourth Amendment protections, defendants must establish that they have a subjective expectation of privacy in the area searched and this expectation must be objectively reasonable. *State v. Robinson*, 293 Kan. 1002, 1014, 270 P.3d 1183 (2012); see *Talkington*, 301 Kan. at 461-62, 477 ("'Where the subjective expectation of privacy *and* its objective reasonableness are both well-established [for example, in a defendant's home], courts tend to state the conclusion of the analysis without distinguishing the two steps.'"). Courts often state that "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). "But the extent to which the Fourth Amendment protects people may depend upon where those people are." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998).

Following the Court's decision in *Florida v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013), a search occurs "when: (1) the government obtains information by physically intruding on a constitutionally protected area, *i.e.*, persons, houses, papers, or effects, 133 S. Ct. at 1414; or (2) invades '"a subjective expectation of privacy that society recognizes as reasonable."'" *Talkington*, 301 Kan. at 462 (citing *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 [2001] [citing *Katz*, 389 U.S. at 361]); see *Rakas*, 439 U.S. 128, 143 n.12 ("Legitimation of expectations of privacy by law must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.").

In earlier times, "anyone legitimately on premises where a search occurs" had standing to challenge a search. *Jones v. United States*, 362 U.S. 257, 267, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960). But not long after *Jones*, the Court abandoned this standard, concluding it created "too broad a gauge for measurement of Fourth Amendment rights." *Rakas*, 439 U.S. at 142. In its place, *Rakas* adopted *Katz*' reasonable-expectation-of-privacy standard. 439 U.S. at 143 (stating *Katz* "provides guidance in defining the scope of the interest protected by the Fourth Amendment"); see *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980) ("[I]n *Rakas* . . . we abandoned a separate inquiry into a defendant's 'standing' to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a 'legitimate expectation of privacy' in the area searched.").

Two more contemporary Supreme Court cases inform our understanding of guest standing. In *Olson*, 495 U.S. at 98, the Court held that overnight guests have a per se legitimate expectation of privacy in their hosts' residence. This result, the Court reasoned,

8

"merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

"From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend." 495 U.S. at 98-99.

A few years later in *Carter*, the Court held two guests lacked standing to challenge a search. There, an officer looked through a gap in a closed window blind and saw two men packaging cocaine. The woman who leased the apartment permitted the men to use the apartment in exchange for some of the cocaine. The two men were from out-of-state. They had never been to the apartment and were in the apartment for only about two and one-half hours solely to package the cocaine. Not until after the men left the apartment and were driving away did the officers stop and arrest them.

The plurality held these men lacked a reasonable expectation of privacy in the apartment because they were engaged in a purely commercial transaction; the men were not overnight guests; they were there for only a short time; and the men had no prior relationship with the woman. And unlike in *Olson*, the Court stated there was nothing to suggest "a degree of acceptance into the household." 525 U.S. at 90.

9

Justice Kennedy—whose vote was necessary to reach the result—concurred because the majority's reasoning "is consistent with [his] view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home." 525 U.S. at 99 (Kennedy, J., concurring). The most important consideration for Justice Kennedy was whether the defendant could establish a "meaningful connection" to the location searched. 525 U.S. at 101 (Kennedy, J., concurring). Under the facts, Justice Kennedy concluded these men could establish "nothing more than a fleeting and insubstantial connection with [the woman's] home." 525 U.S. at 102 (Kennedy, J., concurring).

Consistent with *Carter*, the Tenth Circuit Court of Appeals requires a social guest to show a "'degree of acceptance into the household'" or an "'ongoing and meaningful connection to [the host's] home'" to establish standing. *United States v. Gillom*, 274 F. Supp. 3d 1209, 1215 (D. Kan. 2017) (quoting *United States v. Rhiger*, 315 F.3d 1283, 1286-87 [10th Cir. 2003]); see *Talkington*, 301 Kan. at 479 (applying Tenth Circuit caselaw).

These cases have created a so-called "privacy spectrum." See, e.g., *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000) ("The Court determined that the overnight guest in *Olson* and someone legitimately on the premises represented different ends of the privacy spectrum."). Yet "spectrum" is an imprecise depiction of these holdings to the extent that it suggests a social guest must be an overnight guest to have a reasonable expectation of privacy. See, e.g., *United States v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009) ("To have Fourth Amendment standing, a social guest need not have permission to enter the residence alone or to stay overnight."). To that point, Dannebohm concedes he was not an overnight guest but maintains he had a reasonable expectation of privacy in Tracy's apartment.

10

With little discussion, our past decisions have simply stated that "[s]ocial guests have standing to assert a reasonable, subjective expectation of privacy that their host has in his or her residence." *State v. Huff*, 278 Kan. 214, Syl. ¶ 6, 92 P.3d 604 (2004). More recently, we discussed a social guest's standing in greater depth. See *Talkington*, 301 Kan. 453. In *Talkington*, officers arrived at the house, looking to arrest an unrelated third party on an outstanding warrant. Talkington and the host were standing by the house as the officers arrived. When they saw the officers, the two men ran behind the house but returned not long after. While one of the officers asked them about the third party, the other officer walked to the back of the house. On the ground about 3 to 5 feet from the back door, the officer saw a baggie of methamphetamine partially covered by insulation. The officers arrested Talkington and the host, and they found a baggie of marijuana during an inventory search of Talkington's belongings.

In the host's criminal case, the court suppressed the evidence when it found that the officers conducted an illegal curtilage search. Talkington likewise sought to suppress the evidence in his case, arguing he was entitled to the same ruling as a welcomed social guest. Using the "*Carter* factors," we noted that Talkington had known the host for seven to eight years, and Talkington had visited the house several times. Talkington stopped at the house whenever he was in town, including the previous week. And while at the house, the two men worked together on cars and mopeds in the backyard. On the day of the arrest, Talkington had arrived nearly four hours before the search to help work on a car in the back yard. In the end, we held Talkington had a reasonable expectation of privacy in the host's home, and we suppressed the evidence. 301 Kan. at 482-83, 487-88.

In many respects, Dannebohm has a stronger connection to Tracy's apartment. Tracy and Dannebohm knew each other for about 10 years, and they shared a close, sibling-like relationship. See *United States v. Heath*, 259 F.3d 522, 533 (6th Cir. 2001)

11

("Heath and Horton are cousins; their familial tie is clearly a 'relationship' which pre-dates the apartment's use for illegal conduct as contemplated by *Carter*."). In the weeks before the search, Dannebohm was at the apartment daily. Tracy thought of him as a welcomed guest. She allowed him to stay at the apartment when she was absent. And he kept a duffel bag with his clothing at the apartment.

What is more, Dannebohm at times slept on the couch for hours at a time. Though he was not an overnight guest, the fact that Tracy permitted him to nap there after he ate dinner suggests a significant degree of acceptance into the household. See *Poe*, 556 F.3d at 1122 (permission to stay overnight is not a prerequisite for Fourth Amendment standing). Consider, for example, the social guest in *Rhiger*, 315 F.3d 1283. On the day of the search, he napped at the home while the host was gone. Although he knew the host for only about two weeks before the search, the court held Rhiger had standing to challenge the search:

> "Mr. Rhiger's regular presence at the home, his overnight stays, the discovery of his receipts in the house, and his comfort in entering the residence unannounced and taking a nap, all support our determination that Mr. Rhiger had an ongoing and meaningful connection to Mr. Brown's home as a social guest." 315 F.3d at 1287.

See *Olson*, 495 U.S. at 99 ("We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend.").

Were we to stop here, we would easily conclude Dannebohm has shown a "degree of acceptance into the household" as well as a "meaningful connection" to Tracy's apartment. But the Court of Appeals believed that because Dannebohm was not present at

12

the time of the search, he was not a *current* guest of Tracy's. *Dannebohm*, 2017 WL 3447883, at *5-6. This holding is not entirely clear. Dannebohm was a welcomed guest who frequented Tracy's apartment daily. And he was there on the day of the search. The panel must have thought Dannebohm lost any reasonable expectation of privacy the moment he left the apartment. We disagree.

In *Spinelli v. United States*, 393 U.S. 410, 412, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), the Court hinted that a guest's absence at the time of the search is not fatal to his standing. There, the defendant challenged the constitutionality of a warrant permitting the search of an apartment he was using to conduct an illegal gambling operation. The federal district court found Spinelli lacked standing. The Eighth Circuit reversed and held the magistrate issued the warrant without probable cause.

The Court granted review mainly to discuss the sufficiency of the affidavit. But it commented in dictum:

> "We agree with the Court of Appeals that Spinelli has standing to raise his Fourth Amendment claim. The issue arises because at the time the FBI searched the apartment in which Spinelli was alleged to be conducting his bookmaking operation, the petitioner was not on the premises. Instead, the agents did not execute their search warrant until Spinelli was seen to leave the apartment, lock the door, and enter the hallway. At that point, petitioner was arrested, the key to the apartment was demanded of him, and the search commenced. Since petitioner would plainly have standing if he had been arrested inside the apartment, *Jones v. United States*, 362 U.S. 257, 267 (1960), it cannot matter that the agents preferred to delay the arrest until petitioner stepped into the hallway—especially when the FBI only managed to gain entry into the apartment by requiring petitioner to surrender his key." 393 U.S. at 412 n.2.

13

See *United States v. Jeffers*, 342 U.S. 48, 52, 72 S. Ct. 93, 96 L. Ed. 59 (1951) (holding a defendant who was absent when officers conducted an illegal search of his aunts' hotel room had standing to challenge the search); see also *Brown v. United States*, 411 U.S. 223, 229, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973) (holding there is no standing where "the defendants:  [a] were not on the premises at the time of the contested search and seizure; [b] alleged no proprietary or possessory interest in the premises; and [c] were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.").

Though the Court has since discarded *Jones*' "legitimately on the premises" standard, see *Rakas*, 439 U.S. at 141-48, *Spinelli* and *Jeffers* teach us that it is inconsistent with the Fourth Amendment to permit officers to insulate themselves from a challenge by simply waiting for a guest to leave the area they wish to search. Cf. 6 LaFave, Search and Seizure § 11.3(b) (5th ed. 2012) ("*Rakas*, it must be emphasized, did not question the *result* in *Jones*.'"); see *Rakas*, 439 U.S. at 143 ("[T]he *Jones* statement . . . cannot be taken in its full sweep beyond the facts of that case.").

Still, the Court of Appeals cited three cases to support its holding. All are distinguishable. In *State v. Cortis*, 237 Neb. 97, 465 N.W.2d 132 (1991), the guest had stayed overnight on prior occasions, but the host had not seen the guest for two or three weeks before the search. The guests in *Owens v. State*, 322 Md. 616, 589 A.2d 59 (1991), were like the ones in *Carter*. They drove in from out-of-state and used the host's apartment as a base of operations to sell drugs. In both cases, the courts held the guests did not have standing to challenge the search of the hosts' homes. *Cortis*, 237 Neb. at 103-07; *Owens*, 322 Md. at 627. But neither of these cases resemble the facts here.

The last case is *State v. Francisco*, 107 Wash. App. 247, 26 P.3d 1008 (2001). Francisco hid a murder weapon at his mother's home. Francisco did not live with his mother, but he sometimes stayed the night at her home. He also washed and stored some

14

clothes there. When officers searched the home, Francisco was an overnight guest at his girlfriend's residence. The Washington Court of Appeals held that his "intermittent use of his mother's house . . . does not suggest that he had authority to exclude anyone from the premises or that he could legitimately expect that items he left there would remain undisturbed." 107 Wash. App. at 254.

The court also found it meaningful that Francisco was not physically present during the search. Its rationale was that the guest in *Olson* and the other cases cited by Francisco were current guests who were present at the time of the search. 107 Wash. App. at 255 (citing *State v. Rodriguez*, 65 Wash. App. 409, 828 P.2d 636 [1992]; *Rose v. United States*, 629 A.2d 526 [D.C. 1993]). At the same time, the court acknowledged contrary authority in *Commonwealth v. White*, 459 Pa. 84, 327 A.2d 40 (1974). In that case, the Pennsylvania Supreme Court held a guest's

> "physical absence from the home at the time of the search does not establish that the search was not directed at [the defendant] or that it did not violate his right of privacy. An individual's Effects and Possessions are constitutionally protected from unreasonable search and seizure as well as his person." *White*, 459 Pa. at 89.

Recently a federal district court judge found no reason to believe a guest's reasonable expectation of privacy evaporated the moment he left the household:

> "The government also contends that because Edmond was not physically present at the apartment at the time of the search, he lacked standing. This argument is unsupported. The Court is unaware of any Supreme Court or Seventh Circuit case—and the government has cited none—suggesting that one's standing to challenge a search depends on physical presence at the time and place of the search. Is the government actually suggesting that if the houseguest in *Olson* had gone out to get coffee, the government could have swooped in and searched his room without a warrant or his consent, on the ground that he wasn't there *at that moment*? A rule to this effect would make no sense. A homeowner has standing to challenge the search of his home even if he

15

does not happen to be there at the time of the search; a houseguest who has standing under *Olson* likewise can challenge a search even if he does not happen to be there at the time." *United States v. Edmond*, No. 15 C 3566, 2016 WL 4179176, at *4 (N.D. Ill. 2016) (unpublished opinion).

We agree. We have described a social guest as someone who "stand[s] in the shoes of his or her host." *Talkington*, 301 Kan. 453, Syl. ¶ 17. Since Tracy would have standing to challenge the search of her apartment even if she were not present at the time of the search, see *Alderman v. United States*, 394 U.S. 165, 178, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969), Dannebohm's absence is not fatal to his ability to challenge the search. Under the circumstances of this case, Dannebohm's reasonable expectation of privacy in the apartment did not evaporate the moment he left. To draw such a bright (and easily manipulatable) line would unjustifiably gut a proper reasonable expectation of privacy inquiry, which demands a court's full attention to the totality of the circumstances.

One last point bears mentioning. Throughout the case, the parties disputed Dannebohm's expectation of privacy in the apartment as a whole. The State did not argue that Dannebohm lacked a reasonable expectation of privacy in the location where the evidence was found—Tracy's bedroom. This may have affected our analysis. See *Carter*, 525 U.S. at 88 ("[A] defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."); *State v. Hill*, 127 Ohio App. 3d 441, 449, 713 N.E.2d 73 (1998) (holding that a parolee who lived in his mother's home did not have a reasonable expectation of privacy in his mother's bedroom where parolee stored a safe containing drugs); see also 6 LaFave, Search and Seizure § 11.3(a) (suggesting that in *Bumper v. North Carolina*, 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 [1968], "if the police entry of the premises was lawful and the only conduct subject to challenge is the entry thereafter into a room as to which the grandson has no

16

expectation of privacy, then he well might be found to lack standing to challenge that conduct intruding exclusively upon the grandmother's privacy"). Given the parties' arguments, we will not draw this distinction here.

Reversed and remanded to the Court of Appeals for further proceedings consistent with this decision.