NOT DESIGNATED FOR PUBLICATION

No. 119,698

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

WILLIAM ALLEN FORD,
*Appellee*.


MEMORANDUM OPINION

Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed May 17, 2019.
Reversed and remanded with directions.

*Mitch Spencer*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Matthew B. Metcalf*, of Wellington, for appellee.

Before HILL, P.J., BRUNS, J., and BURGESS, S.J.

PER CURIAM: The State of Kansas appeals the district court's order granting William Allen Ford's motion to suppress drug evidence discovered in the parking lot of a Sonic Drive-In. On appeal, the State makes several arguments in support of its position that the district court erred. Because the person who abandoned the drugs in the parking lot open to the public did not have a reasonable expectation of privacy, we conclude the district court should not have suppressed the evidence. Rather, the State should have been permitted to proceed further in an attempt to link Ford to the evidence. We take no position regarding whether the drugs belonged to Ford nor do we address the other arguments presented by the State. Thus, we reverse and remand for further proceedings.

1

On January 28, 2018, Officer Matthew Nelson of the Wellington Police Department responded to a call at a Jump Start Conoco gas station and convenience store to investigate the use of a stolen credit card. The credit card had been reported stolen in Oklahoma. Officer Wylie and Captain Nefzger also responded to the call.

At the Jump Start Conoco station, Officer Nelson spoke with the assistant manager regarding the use of the stolen credit card at the convenience store. While Officer Nelson was still talking to the Jump Start employee, the manager of a Sonic Drive-In located across the street from the gas station and convenience store approached him. The Sonic manager informed Officer Nelson that someone parked a van in the restaurant's parking lot for several hours. The Sonic manager also told Officer Nelson that his employees had told him there had been drug activity in the parking lot.

Officer Nelson asked the manager of the Sonic Drive-In if the people in the van had made a purchase at the Sonic Drive-In using a credit card. The Sonic manager answered that they had done so. Officer Nelson confirmed that the stolen card had also been used at the Sonic Drive-In. With this additional information, Officers Nelson and Wylie decided that it was "reasonable . . . to believe that [they] needed to go make contact with these individuals at Sonic."

Officer Nelson, Officer Wylie, and Captain Nefzger walked across the street to the Sonic Drive-In parking lot. In doing so, they noticed a green minivan parked in the northeast section of the parking lot. This portion of the Sonic Drive-In parking lot was unpaved and covered with gravel. The officers saw that the doors of the van were open and the hood was up. They also determined that nobody was inside the van. However, they could see several items of personal property, including a purse and a cell phone,

2

which remained in the vehicle. According to Officer Nelson, it appeared as if someone left the van "in a hurry."

The officers were told that the occupants of the van were a white male with a scruffy beard wearing a brown coat and jeans as well as a white female wearing a gray hoodie. After waiting a few minutes to see if anyone returned to the van, the officers decided to look for the occupants. A patron at the laundromat around the corner from the Sonic Drive-In pointed out two people who fit the description of the occupants of the van walking nearby.

As Officer Nelson approached the man and woman, they started to walk in the opposite direction. He asked them to stop and they complied. Officer Nelson explained that he was investigating the use of a stolen credit card. Both the man and woman denied possessing stolen credit cards. The couple informed Officer Nelson that they had just been to a nearby Dollar General store.

Officer Nelson requested identification from both the man and the woman. The man provided an offender report from Oklahoma that identified him as William Ford. The woman provided identification showing her name was Natasha Andrews. Although Ford indicated that he did not own the van, he said that he planned to purchase it from a friend. He also indicated that he had borrowed the van from the friend but that it had broken down. So, they were simply hanging around the area while waiting on someone to pick them up.

After telling Ford about the stolen credit card used at the Jump Start Conoco and the Sonic Drive-In, Ford and Andrews denied possessing stolen credit cards. Officer Nelson asked Ford and Andrews if they would walk back to the Sonic Drive-In parking lot. He also asked Ford if he could search the van for stolen credit cards. Ford gave

permission for Officer Nelson to search the van and the three walked back to Sonic Drive-In.

Officer Nelson also asked if he could search Ford for stolen credit cards and he denied the request. Next, Officer Nelson asked Ford if he could just search his wallet for stolen credit cards. Again, Ford declined the request and told Officer Nelson that he would need a warrant to do so. Ford also told Officer Nelson that the last time he had allowed an officer to search his wallet he went to prison. Officer Nelson informed Ford that because he was on parole, he must cooperate with law enforcement officers. Ford continued to refuse.

Officer Nelson contacted Ford's after-hours parole officer in Wichita. The parole officer confirmed that Ford was on parole and that he needed to submit to a request for a search by a law enforcement officer. Officer Nelson informed Ford of this condition of his parole, and Ford allowed the officer to search him. According to Officer Nelson, Ford "continued to drop his arms" and "to move away" during the search. As such, he told Ford several times to remain still during the search. Officer Nelson would later testify at the suppression hearing that based upon his training and experience, Ford's behavior indicated that he was "trying to lead me away from something and try[ing] to conceal something[.]"

Officer Nelson did not find any contraband during the pat-down or in searching Ford's wallet. Although Ford's wallet contained a bank card from Stockton, Kansas, it was not the card used at the Jump Start Conoco or the Sonic Drive-In. Officer Nelson did not find any other credit cards on Ford's person. As Ford, Andrews, and Officer Nelson walked back to the Sonic Drive-In parking lot, the officer noticed that Ford was walking with a limp and noticed a bulge in front of one of Ford's shins.

Upon returning to the van, Ford explained that the vehicle belonged to a woman he lived with and claimed that he had permission to drive the van. He also said that he was the only one who had driven the van since he borrowed it from his friend. He then told Officer Nelson that he no longer wanted the officers to search the van.

Nevertheless, Officer Nelson and Officer Wylie searched the van while Captain Nefzger stayed with Ford and Andrews. During the search, the officers found a small box labelled "Love Notes" under the driver's seat and looked in it because it was big enough to hold a credit card. Inside the box, the officers found a digital scale covered in a white residue, which they believed resembled methamphetamine. The officers also found a pipe covered in a similar white residue as well as small baggies covered in the same residue.

Officer Nelson arrested both Ford and Andrews for possession of drug paraphernalia. They were then transported to county jail. After speaking to Andrews at the jail, Officer Nelson returned to the Sonic Drive-In. It is unclear from the record what Andrews may have said to the officer to prompt him to return to Sonic Drive-In. Regardless, when he returned, another Sonic manager told Officer Nelson that she saw Ford "reaching in his pants, moving his hands around" while he sat on the ground during the search of the van.

Specifically, the Sonic Drive-In manager told Officer Nelson that she saw Ford bend his knees, put his hands into his right pocket, and transfer something from one hand to the other hand. According to the manager, Ford would then place his hand down to his left side. However, she was not certain whether Ford was simply placing his hands on the ground or attempting to move the gravel around. To the manager, it appeared that Ford was "messing with something on the ground."

After having a Sonic employee move a vehicle that had subsequently been parked where Ford and Andrews had been sitting, Officer Nelson and the Sonic manager noticed

5

a small pile of gravel. According to Officer Nelson, this formation "wasn't common to the rest of the parking lot" and was located just "to the left of where Mr. Ford had been sitting." The Sonic manager estimated the pile of gravel to be approximately 1 1/2 feet from where Ford sat. The manager noted that the area was where Ford had been because she could see indentations in the dirt from Ford's boots.

Under the pile of gravel, Officer Nelson found several baggies. After taking photographs of the area and the items recovered, the baggies were sent for testing. The testing ultimately revealed that the baggies contained methamphetamine and marijuana.

The State charged Ford with one count of possession of methamphetamine, one count of felony possession of drug paraphernalia, one count of possession of marijuana, and one count of misdemeanor possession of drug paraphernalia. It appears that no charges were filed against Andrews. At a suppression hearing held on June 13, 2018, Ford argued that all of the evidence should be suppressed because the initial detention was illegal. In response, the State argued that the drugs found under a pile of rocks in the gravel portion of the parking lot of the Sonic Drive-In had been abandoned. As such, the State argued that Ford had no privacy interests in those items.

The district court found that Ford had standing to challenge the seizure of the drugs found under the pile of rocks because "he had a privacy interest in what was in his pocket. And because of the illegal detention, he had to get rid of it." The district court also found that the officers had reasonable suspicion to stop Ford and Andrews, to ask for their identification, and to ask about the stolen credit card. However, it appears that the district court believed the encounter should have stopped when no evidence of a stolen credit card was found. Ultimately, the district court found that the "drugs [were] the product of an illegal detention and are . . . suppressed." On July 3, 2018, the district court filed a journal entry memorializing its decision.

6

ANALYSIS

The Fourth Amendment to the United States Constitution applies to the states through the Constitution's Fourteenth Amendment. *State v. Baker*, 306 Kan. 585, 589, 395 P.3d 422 (2017). It and Section 15 of the Kansas Constitution Bill of Rights protect Kansas citizens from "unreasonable searches and seizures." 306 Kan. at 589-90. A warrantless search or seizure is presumptively unreasonable unless that search or seizure falls within certain recognized exceptions to the search warrant requirement. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016).

The standard of review for a district court's decision on a motion to suppress has two components. First, we review the district court's factual findings to determine whether they are supported by substantial competent evidence. Second, we review the ultimate legal conclusion reached by the district court using a de novo standard. In reviewing the factual findings, we do not reweigh the evidence or assess the credibility of witnesses. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). Likewise, when the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress is a question of law over which we exercise unlimited review. 307 Kan. at 827.

In this interlocutory appeal, the State first argues that Ford

"lacked standing to move to suppress the methamphetamine, marijuana, and drug paraphernalia baggies that were found in the Sonic parking lot by Officer . . . Nelson . . . for either of two reasons: (1) because [Ford] does not have an expectation of privacy in the Sonic Parking lot; or (2) because [Ford] does not have an expectation of privacy in the abandoned property—methamphetamine, marijuana, and drug paraphernalia baggies found in the Sonic parking lot under a pile of rocks."

7

A defendant may not object to a seizure if that defendant lacks "proper standing to challenge the validity of the search." *State v. Talkington*, 301 Kan. 453, Syl. ¶ 10, 345 P.3d 258 (2015). This burden lies with the defendant to demonstrate an "expectation of privacy in the property searched." 301 Kan. 453, Syl. ¶ 10. A defendant's testimony regarding standing at a suppression hearing will not jeopardize the defendant's defense at trial. 301 Kan. 453, Syl. ¶ 10. Moreover, a defendant must prove not only that he or she has "a subjective expectation of privacy in the area searched" but also that the alleged privacy expectation is "objectively reasonable." *State v. Dannebohm*, 308 Kan. 528, 533-34, 421 P.3d 751 (2018); *State v. Robinson*, 293 Kan. 1002, 1014, 270 P.3d 1183 (2012); see *Talkington*, 301 Kan. at 461-62, 477.

Both the Kansas Supreme Court and our court have held that a person does not have a reasonable expectation of privacy in public parking lots. In *State v. Berry*, 223 Kan. 102, 105-06, 573 P.2d 584 (1977), our Supreme Court upheld the seizure of a bag filled with balloons containing heroin hidden in a bush outside of a motel room. Although the defendant argued the drug evidence should be suppressed because the law enforcement officers who seized it did not have a search warrant, the Supreme Court concluded that the bush was part of the "general landscaping" in the motel parking lot and was not under the control of the defendant. Further, "[t]he bush was open to public view and access and the defendant had no basis for any reasonable expectation of privacy in the bush . . . ." 223 Kan. at 106.

Similarly, this court has determined that a defendant lacked a reasonable expectation of privacy in a parking lot. *State v. McMillin*, 23 Kan. App. 2d 100, 104-05, 927 P.2d 949 (1996). Specifically, *McMillin* panel explained that

> "the parking lot where [the defendant] left his car was part of the motel complex. It did
> not come under his control by virtue of his occupancy of his [motel] room. The parking
> lot was open to public view, and [the defendant] certainly had no authority to exclude

8

others from the lot. [The defendant] had no basis for any reasonable expectation of privacy in the parking lot." 23 Kan. App. 2d at 104.

Here, Officer Nelson found the suppressed drug evidence under a pile of gravel in the parking lot of a Sonic Drive-In. The parking lot was not under Ford's control. Likewise, the parking lot was open and accessible to the public. Ford did not have any authority to exclude others from the parking lot where he allegedly abandoned the drugs. Thus, we conclude that Ford did not have a legitimate expectation of privacy in the parking lot of the Sonic Drive-In and lacked standing to object to the search of that place.

We also find that someone—perhaps Ford—abandoned the drugs in the parking lot. A defendant may not contest the legality of a search or seizure if the property searched or seized has been abandoned. *State v. Ralston*, 45 Kan. App. 2d 1024, Syl. ¶ 2, 257 P.3d 814 (2011). The Fourth Amendment's protections against unreasonable searches and seizures cease when a defendant abandons property, "absent a manifested reasonable expectation of privacy." 45 Kan. App. 2d 1024, Syl. ¶ 4.

In *Ralston*, the defendant was a passenger in a stolen vehicle that was involved in a police pursuit. After the driver crashed the vehicle, the defendant ran from the scene without her purse. In searching the vehicle, law enforcement officers found the defendant's purse, which contained methamphetamine. On appeal, this court concluded that the defendant had abandoned her purse and lacked standing to contest the search. 45 Kan. App. 2d at 1029. In reaching this conclusion, the panel found that the defendant's "expectation of privacy in her purse was not objectively reasonable, and she therefore lacked standing to challenge the search." 45 Kan. App. 2d at 1029. See also *State v. Brunson*, 13 Kan. App. 2d 384, 389, 771 P.2d 938 (1989) (no reasonable expectation of privacy in a vehicle abandoned on a golf course).

9

In the present case, whoever placed the drugs underneath a pile of gravel in the parking lot of the Sonic Drive-In abandoned the property. By purposely leaving the property in a parking lot that is accessible to the public, the person who left the drugs there gave up any reasonable expectation of privacy in that property. Even if the property itself was not abandoned, the person who left it there gives up any reasonable expectation of privacy in the property by leaving it in a public parking lot. See *Brunson*, 13 Kan. App. 2d at 394-95. Accordingly, although Ford may still have a valid defense regarding whether the drugs found by Officer Nelson were ever in his possession, we conclude that he lacks a reasonable expectation of privacy—and consequently lacks standing—to object to the seizure of the drugs from the Sonic Drive-In parking lot.

We, therefore, reverse the district court's order of suppression and remand this case for further proceedings. In light of our decision, it is not necessary for us to reach the other issues presented on appeal.

Reversed and remanded with directions.