NOT DESIGNATED FOR PUBLICATION

No. 127,188

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SAMUEL ROMAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sumner District Court; WILLIAM R. MOTT, judge. Oral argument held March 12, 2025. Opinion filed May 9, 2025. Affirmed.

*Martin J. Peck*, of Wellington, for appellant.

*Ryan J. Ott*, assistant solicitor general, *Ethan C. Zipf-Sigler*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before MALONE, P.J., SCHROEDER and CLINE, JJ.

PER CURIAM: Samuel Roman timely appeals from his convictions and sentences for nine counts of animal cruelty, claiming the district court erred in denying his motion to suppress evidence obtained in a warrantless search of dog kennels on his property. Specifically, he asserts the district court erred in finding the open fields doctrine applied because the dog kennels were located within the curtilage of his house. Roman contends the evidence should be suppressed, his convictions vacated, and the case remanded with instructions to dismiss with prejudice. Upon an extensive review of the record, we find no error by the district court, and we affirm Roman's convictions and sentences.

1

Roman and his wife operated a licensed dog breeding kennel on their property in Sumner County. On September 23, 2022, Sumner County Sheriff's Deputy Jeff Miller was dispatched to Roman's property after an anonymous caller reported neglected and dead animals on the property, including horses, cattle, and dogs. The anonymous caller also reported "children being neglected inside the house, specifically having feces all over them and them being allowed to play with guns."

Miller arrived at Roman's house and knocked on the door, but no one answered. Miller looked in an open window and did not see feces in that area of the house. Miller heard dogs barking and, because he was there for an animal welfare check and believed he had probable cause to investigate, walked the property to check on the welfare of the animals. Miller discovered a dog barn with sectioned off kennels containing multiple dogs and a dog run. Miller found three dogs with traumatic injuries in need of immediate medical attention. Roman and his wife claimed the injuries were recent and were being treated with antibiotics. The three dogs were seized from the property. After examining the three dogs, a veterinarian determined the wounds were not fresh.

After the three dogs were seized, the Kansas Department of Agriculture (KDA) received a complaint regarding the health and welfare of the animals on Roman's property. On September 28, 2022, KDA filed an order revoking license and order for seizure of animals. KDA determined it would perform an inspection of the dog kennels on Roman's property pursuant to the Kansas Pet Animal Act, K.S.A. 47-1701 et seq. and requested an escort from the Sheriff's Department. On September 28, 2022, KDA seized 65 dogs remaining on the premises.

Though 65 dogs were seized, the State ultimately charged Roman with 58 counts of animal cruelty under K.S.A. 2022 Supp. 21-6412(a)(3). Roman filed a pro se motion to

suppress and dismiss with prejudice, asking the district court to suppress all evidence obtained against him on September 23, 2022, and September 28, 2022, for lack of a lawful search warrant. Roman claimed the deputies' search warrant related to the September 28, 2022, seizure was based on fruit of the poisonous tree from the first unlawful entry.

The State responded, noting the two searches and seizures were separate events—the first warrantless open field search conducted by the Sheriff's Department involving the removal of three dogs, and the second conducted by KDA pursuant to Roman's dog breeding license under K.S.A. 47-1701 and K.S.A. 47-1709. The State also contended the deputies had the authority to search the property under K.S.A. 2022 Supp. 21-6412 after receiving a tip Roman had animals on his property in need of care, and the deputies had probable cause to search the premises because the condition of the three severely injured dogs constituted exigent circumstances for a warrantless seizure.

The district court conducted a hearing on Roman's motion to suppress and heard testimony from the three deputies who were dispatched to Roman's property on September 23, 2022, and from the deputy who submitted an affidavit for arrest or summons of Roman for animal cruelty. The district court took the matter under advisement.

The State filed a supplementary response in opposition to Roman's motion to suppress, expanding its argument that law enforcement had probable cause and exigent circumstances to search the property. The State also argued the search was lawful under the open fields doctrine because the area of property searched was not within the curtilage of Roman's home. Roman filed a response, essentially arguing, among other things, there was no probable cause and exigent circumstances to search the property, the search was invalid, and the open fields doctrine did not apply.

The district court found: (1) The deputies did not have probable cause with exigent circumstances to justify trespassing on Roman's property; (2) K.S.A. 2022 Supp. 21-6412(e) did not give the deputies authority to search Roman's property for evidence of animal cruelty for the purpose of checking on the welfare of animals; and (3) the dog kennels were not within the curtilage of the residence and the open fields doctrine applied. The district court denied Roman's motion to suppress based on the open fields doctrine.

Before trial, the State dismissed 39 counts of animal cruelty, leaving 19 counts to be addressed by the court. Roman insisted on representing himself at trial—eventually calling in standby counsel to take over. Upon resting, the State dismissed another count, and the district court found Roman not guilty of eight counts of animal cruelty. Roman was ultimately convicted of nine counts of animal cruelty. The district court sentenced Roman to one year in the Sumner County jail on seven counts of animal cruelty and six months in the Sumner County jail for two counts of animal cruelty. It is unclear from the record if the State dismissed the remaining count. Some counts were to run concurrent while others ran consecutive for a total term of four years in the county jail. The district court later determined no restitution order would be imposed.

ANALYSIS

*The Open Fields Doctrine Applies to the Search of Roman's Dog Kennels*

Roman argues the district court erred in failing to suppress evidence seized from his residence because (1) law enforcement failed to cease their investigation at the conclusion of the child welfare check, and (2) the State failed to prove the open fields doctrine applied. Roman contends the evidence taken from his property should be suppressed, the search warrant based on the seized evidence should be quashed, and we

should vacate his convictions and sentences and remand with instructions to dismiss with prejudice.

*Preservation*

The State asserts Roman failed to lodge a specific contemporaneous objection when the evidence was introduced at trial, failed to cite to the record on appeal in his appellate brief showing where the issue was renewed at trial through a timely and specific objection, and failed to justify in his brief why there was no timely and specific objection below. The State admits Roman eventually objected to the admission of evidence at trial once standby counsel stepped in to represent him. The State asks us to affirm the district court's finding as Roman failed to preserve his claim for appellate review.

Roman essentially admits he failed to contemporaneously object to the admission of evidence at trial but asks us to find he preserved the issue for appeal. Roman claims he did not need to renew the objection because he had a bench trial rather than a jury trial.

> "Under K.S.A. 60-404, 'a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review.' 'The purpose of the rule is to avoid the use of "tainted evidence [and thereby] avoid possible reversal and a new trial."' 'Because an in limine ruling "is subject to change when the case unfolds," a pretrial objection must be contemporaneously renewed during trial or preserved through a standing objection.' [Citations omitted.]." *State v. Richard*, 300 Kan. 715, 720-21, 333 P.3d 179 (2014).

"This rule acknowledges that different, more, or less evidence may come in at trial than was admitted or proffered at a pretrial hearing. Or a district court judge may simply see the issue in a different light after hearing additional arguments and evidence." *State v. Ballou*, 310 Kan. 591, 613, 448 P.3d 479 (2019).

In *State v. Parson*, 226 Kan. 491, 493, 601 P.2d 680 (1979), our Supreme Court explained:

"[K.S.A. 60-404] is intended to prevent reversals for improper admission of evidence unless a specific objection is made at the time the evidence is introduced. It does not, however, operate in a vacuum and has been relaxed to fit trial situations, such as where the objectional matter isn't readily apparent or in a trial to the court rather than to a jury."

In *State v. Bogguess*, 293 Kan. 743, 268 P.3d 481 (2012), Bogguess filed a pretrial motion to suppress and later proceeded to a bench trial on stipulated evidence. Before trial, Bogguess informed the district court he wished to retain his appeal rights. Our Supreme Court determined the State and the district court knew Bogguess objected to the admission of certain statements he had made but clearly indicated he wanted to proceed to a bench trial on stipulated facts while reserving his right to appeal the issues. 293 Kan. at 747. Our Supreme Court stated:

"[W]hen the bench trial is conducted by the same judge who presided over the hearing on the motion to suppress, there is no reason to rehash the same arguments when no additional evidence has been presented. The lack of a contemporaneous objection does not bar our review under these circumstances." 293 Kan. at 747.

Like *Bogguess,* the district court here conducted a pretrial hearing on Roman's motion to suppress. The district court took the matter under advisement, and the parties each filed a supplemental brief in support of their position. The district court heard additional pro se motions before trial, including another pro se motion from Roman to suppress the evidence seized from his property. The district court explained:  "This is really just a re-packaged re-argument of the Motion to Suppress from earlier, you know. So my previous ruling on this issue still stands."

Roman insisted on proceeding to trial pro se. On the third day of trial, Roman's standby counsel stepped in to represent him and lodged a continuing objection to the admission of evidence at trial. While Roman did not stipulate to any evidence admitted, he proceeded with a bench trial before the same judge who heard his motion to suppress. We will apply the reasoning in *Bogguess* and find the lack of a contemporaneous objection does not bar our review under the circumstances. See 293 Kan. at 747.

*Standard of review*

Our standard of review of a district court's decision on a motion to suppress has two components. We review the district court's factual findings to determine whether they are supported by substantial competent evidence. "'Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.'" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). The ultimate legal conclusion, however, is reviewed using a de novo standard. *State v. Martin*, 318 Kan. 538, 558, 544 P.3d 820 (2024). "'If there are no disputed material facts, the issue [of whether to suppress evidence] is a question of law over which the appellate court has unlimited review.'" *State v. Crudo*, 318 Kan. 32, 34, 541 P.3d 67 (2024). We do not reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts. *Talkington*, 301 Kan. at 461.

The Fourth Amendment to the United States Constitution provides, in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Section 15 of the Kansas Constitution Bill of Rights provides protection coextensive with the Fourth Amendment. *State v. Daino*, 312 Kan. 390, 396, 475 P.3d 354 (2020). A warrantless search is per se unreasonable unless it falls under one of the recognized exceptions to the warrant requirement. The burden is on the State to establish the search

7

and seizure were lawful under the Fourth Amendment. *State v. Hillard*, 315 Kan. 732, 747, 511 P.3d 883 (2022).

*Welfare check*

Roman argues the district court erred in failing to suppress the evidence seized from his property because law enforcement failed to stop its investigation at the conclusion of the child welfare check. Roman claims: "There is no such thing as an animal welfare check" and law enforcement should have left his property after determining no people were in danger. The State argues this issue is irrelevant to the appeal as the district court found the continued search of the property was proper only under the open fields doctrine. We agree.

*Standing*

Roman contends he has standing to challenge the search of his residence under the Fourth Amendment and section 15 of the Kansas Constitution Bill of Rights as he had a legitimate expectation of privacy in the areas searched. Roman asserts he had an expectation of privacy in his home to "'be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013).

A defendant must have proper standing to challenge the validity of a search to object to the seizure of evidence. The burden is on Roman to show he had an expectation of privacy in the property searched. That is, Roman must demonstrate a subjective expectation of privacy in the area searched and that expectation was objectively reasonable. If Roman can establish standing, the State bears the burden to prove by a preponderance of the evidence the search and seizure was lawful. See *Talkington*, 301 Kan. at 476-77.

There is no dispute the open field search was conducted on Roman's property and the dogs seized were Roman's dogs. Roman has standing to contest the search. Thus, the relevant question on appeal is whether the search and seizure occurred within the curtilage or an open field.

*Open fields doctrine contrasted with curtilage*

Roman argues the State failed to meet its burden establishing the dog kennels were outside the curtilage of his residence in an open field. The State has the burden to prove the area searched was not within the curtilage of the residence. See 301 Kan. at 476.

Fourth Amendment protections apply to the curtilage—the area immediately surrounding the residence in which "the intimate activity associated with the 'sanctity of a man's home and the privacies of life'" extend. *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984); see *State v. Fisher*, 283 Kan. 272, 282, 154 P.3d 455 (2007). The Fourth Amendment protection does not extend to open fields. *Oliver*, 466 U.S. at 176. The "'open fields' doctrine" allows law enforcement "to enter and search a field without a warrant" as it "is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Oliver*, 466 U.S. at 173, 177. An open field need not be "'"open" nor a "field"'" as used in their ordinary meaning. *United States v. Dunn*, 480 U.S. 294, 304, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987). The United States Supreme Court also noted:  "[I]n the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment." *Oliver*, 466 U.S. at 183-84.

The *Oliver* Court explained:

"[O]pen fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance. There is

no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas." 466 U.S. at 179.

The *Dunn* Court identified four factors to determine the extent of a curtilage:

"'[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.'" *Talkington*, 301 Kan. at 463 (quoting *Dunn*, 480 U.S. at 301).

These factors are to be "analytical tools" rather than a rigid formula. *Dunn*, 480 U.S. at 301. We address each of these factors as they apply to Roman's property.

*The proximity of the area claimed to be curtilage to the home*

Roman argues the State failed to put on evidence at the suppression hearing regarding the distance between the house and the kennels. Our Supreme Court "recognized there is no fixed distance at which curtilage ends." *Talkington*, 301 Kan. at 464. Curtilage may extend and include a larger area in a rural setting. See *Fisher*, 283 Kan. at 288.

The district court explained, based on the evidence admitted during the suppression hearing, it had no way of determining the distance between different areas of the property, including the distance between the residence and the dog kennels. The district court noted it could be inferred from the evidence the kennels were within walking distance from the house and explained:  "What is certain, is that the dog kennels are even further from the house than the cattle pen." The district court relied on

10

Defendant's Exhibit D and estimated the dog kennels were about 75-100 yards from the driveway. Roman's pro se rebuttal supplemental brief stated the two kennels were 271.66 feet (approximately 90 yards) and 329.54 feet (approximately 109 yards) away from his residence. The district court apparently did not rely on Roman's supplemental brief, but the court's estimated distances were more or less within the correct range.

While there is no fixed distance within which the curtilage ends, *Talkington*, 301 Kan. at 464, the evidence supported the district court's finding that there was a cattle pen between the house and the dog kennels. Roman submitted a picture of the kennels taken from the driveway as evidence. While the district court noted it could not tell where the house was in the picture, one of the deputies who was on scene during the seizure testified the picture was taken from the driveway "looking towards your puppy barn" and there was a clear line of sight to the kennel. The exhibit shows an open area large enough for a horse to graze with some fences and structures in the distance. The State also attached an exhibit to its supplemental response in opposition to the motion to suppress of an aerial view of the property, showing the residence and noting the location of the kennels.

While the district court seemed to have estimated the distance between the house and the dog kennels, Roman disclosed the distance in his supplemental brief on his motion to suppress. Substantial competent evidence supports the district court's finding the proximity of the dog kennels to the home does not weigh in favor of finding the kennels were within the curtilage of the home.

*Whether the area is included within an enclosure surrounding the home*

As our Supreme Court explained in *Talkington*:

> "'"[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience.'" While not conclusive, '[f]encing configurations are important factors in defining the curtilage.' In rural areas, natural boundaries such as thick trees or shrubbery may indicate an area '"to which the activity of home life extends.'" [Citations omitted.]" 301 Kan. at 465.

Here, the district court noted no fence surrounded the property or the dog kennels, though there was a significant number of trees around the property and the kennels could not be seen from the roadways. There were also no sidewalks or pathways leading to the kennels. The district court concluded, assuming Roman possessed a subjective expectation of privacy in the dog kennels, this factor weighed in favor of finding the dog kennels were within the curtilage of the property—a finding in Roman's favor.

We observe no error in the district court's conclusion on this factor.

*The nature of the uses to which the area is put*

Roman suggests there is "a long American tradition of animal husbandry within the curtilage of farm residences." Roman relies on practices from as early as the 1700s in which barns were often connected to the house.

An area is more likely to be within the curtilage of a home if it is used for "intimate" activities of the home. *Oliver*, 466 U.S. at 180. Here, the district court found:

"[T]he evidence clearly shows that the dog pen area is part of a commercial enterprise that had several names throughout the years, *Tree of Life Kennels* and *Doggy Time* among them. On September 23, 2022, the defendant's commercial operation used the kennels to house approximately fifty-eight dogs that were subject to inspection by the Kansas Department of Agriculture. [A Sumner County Sheriff's Deputy] had even escorted an official from the Kansas Department of Agriculture during an inspection of the property in the preceding year.

"Contrary to being connected with the intimate activities of the home, the dog kennels were placed on the other side of a cattle pen pictured in Defendant's Exhibits B and D. There is no evidence or indication that the dog kennel area was used for any other activity, such as outdoor entertaining, gardening, or any other curtilage-type activity typically engaged in by homeowners. It's hard to imagine that such intimate, curtilage-type activity would be undertaken near the dog kennels given the noise and smell this amount of [canine] presence would produce. This factor weighs heavily [in] favor of finding that the open fields doctrine applies, and that the dog pens were not within the curtilage of the defendant's home."

We agree with the district court. The evidence reflects the nature of the use of the kennels was not connected with intimate activities of the home. In fact, the kennels were used for a licensed dog-breeding operation subject to periodic inspection without prior notice by the KDA.

As a licensed breeder, Roman was subject to K.S.A. 47-1709(b), which states:

"The commissioner or the commissioner's authorized, trained representatives may inspect each premises for which a license or permit has been issued under K.S.A. 47-1701 et seq., and amendments thereto. The acceptance of a license or permit shall conclusively be deemed to be the consent of the licensee or permittee to the right of entry and inspection of the licensed or permitted premises by the commissioner or the commissioner's authorized, trained representatives at reasonable times with the owner or owner's representative present. Refusal of such entry and inspection shall be grounds for suspension or revocation of the license or permit. Notice shall not be given to any person prior to inspection."

It is hard to imagine a reasonable expectation of privacy in an area of the property subject to inspection without notice to maintain such business. Substantial competent evidence supports the district court's finding this factor heavily weighed toward the dog kennels being in an open field and not within the curtilage of the home.

*The steps taken by the resident to protect the area from outside observation*

The district court found: "The dogs were in pens and placed at a spot where, according to . . . testimony [of one of the responding officers on September 23, 2022], they could not be seen from any part of the road. This factor weighs in favor of finding the dog pens were within the curtilage of the home." The district court found this factor was in Roman's favor to suppress the evidence. And we observe no error in this finding.

*The area searched was not within the curtilage of Roman's home based on the* Dunn *factors as a whole.*

The district court, after weighing all four *Dunn* factors, found the kennels "were not within the curtilage of Roman's home, and that the open fields doctrine applies." Thus, the district court denied Roman's motion to suppress the evidence seized from his property on September 23, 2022, and September 28, 2022. Though only two of the four factors weighed in favor of the dog kennels being in open fields rather than the curtilage, the nature of the uses of the areas at issue heavily weigh toward an open fields finding. See *Oliver*, 466 U.S. at 179. As in any Fourth Amendment determination, the totality of the circumstances is the crux of our analysis. See *Hillard*, 315 Kan. at 747; *Fisher*, 283 Kan. at 281. And when applying a factor test: "No one factor is controlling, and other factors also may be relevant to the . . . analysis." *State v. Sanders*, 310 Kan. 279, 295, 445 P.3d 1144 (2019) (applying factors test under attenuation doctrine).

"[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *United States v. Jones*, 565 U.S. 400, 406, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012). "Quite simply, an open field, unlike the curtilage of a home, is not one of those protected areas enumerated in the Fourth Amendment. The Government's physical intrusion on such an area . . . is of no Fourth Amendment significance. [Citations omitted.]" 565 U.S. at 411.

Under the totality of the circumstances, the open fields doctrine applies here; thus, the search did not intrude upon one of the enumerated areas protected by the Fourth Amendment, and Roman did not have a reasonable expectation of privacy in the area where the dog kennels were located. The kennels were located almost 100 yards from his house and used for highly regulated business purposes subject to random inspection. Because the dog kennels were not closely associated—either in nature or proximity—with the "intimate activities" of Roman's home, the officers' searches did not intrude upon the curtilage. See *Oliver*, 466 U.S. at 179. Therefore, we find no error in the district court's denial of Roman's motion to suppress, and we affirm Roman's convictions and sentences.

Affirmed.